STATE OF NEBRASKA, EX REL. BOARD OF TRANSPORTATION, v. SIOUX CITY, O'NEILL & WESTERN RAILROAD COMPANY, F. C. HILL, ITS RECEIVER, AND FREMONT, ELKHORN & MISSOURI VALLEY RAILROAD COMPANY.

FILED JANUARY 9, 1896.    No. 7526.

1. **Constitutional Law:** FEDERAL DECISIONS: STARE DECISIS. The construction placed upon provisions of the federal constitution by the supreme court of the United States must be followed by state courts in all matters to which such provisions are applicable.   Following *Franklin v. Kelly,* 2 Neb., 79; *Bressler v. Wayne County,* 25 Neb., 468.

2. ———: STATUTES: RAILROAD COMPANIES: TRANSFER SWITCHES. The provisions of chapter 11, Laws, 1893, which require railroad companies, as an absolute finality, and without the right of judicial investigation by due process of law, to carry freights over longer lines for the same rates as required by any railroad company for hauling the same freight between the same points by a shorter line, no matter how great the disparity in the length of such hauls may be, is in conflict with the provisions of the fourteenth amendment of the constitution of the United States, that no state shall "deprive any person of life, liberty, or property without due process of law." Following *Chicago, M. & St. P. R. Co. v. Minnesota,* 134 U. S., 418, 458, and *Reagan v. Farmers Loan & Trust Co.,* 154 U. S., 362.

3. ———: ———: ———: COURTS. It is not within the power of a court to make such an arrangement for the business intercourse of common carriers as in the opinion of such court they ought to make for themselves, for such function is legislative, rather than judicial. Following *Atchison, T. & S. F. R. Co. v. Denver & N. O. R. Co.,* 110 U. S., 667; *Pullman Palace Car Co. v. Missouri P. R. Co.,* 115 U. S., 587; *Express Cases,* 117 U. S., 1.

4. ———: ———: ———. The power of the legislature to require railroad lines to build and maintain transfer switches between themselves, being but an incidental consideration, is not discussed or decided in this case. The main purpose of chapter 11, Laws, 1893, being the regulation of business intercourse of connecting railroad companies, said act is held invalid, as not being susceptible of enforcement as an entirety, for the reasons given in the second and third paragraphs of this syllabus.

ERROR from the district court of Holt county. Tried below before CHAPMAN, J.

The opinion contains a statement of the case.

*A. S. Churchill, Attorney General, George A. Day, Deputy Attorney General,* and *W. A. Dilworth,* for plaintiff in error:

In an argument against the contentions that chapter 11, Session Laws of 1893, is void for uncertainty, and that the act creates no tribunal, in case of a disagreement of the companies, to determine their respective rights, reference

was made to the following authorities: *Texas Express Co. v. Texas & P. R. Co.,* 6 Fed. Rep., 437; *Southern Express Co. v. Iron M. & S. R. Co.,* 10 Fed. Rep., 210; *McCoy v. Cincinnati, I., St. L. & C. R. Co.,* 13 Fed. Rep., 3; *State v. Republican V. R. Co.,* 17 Neb., 647.

The transfer switch is a facility for conducting the business of a railroad. The act does not, therefore, deprive the carriers of their property without due process of law. It does not deny them the equal protection of law, nor provide for taking their property without compensation. Its effect is not to impair the obligations of contracts. (*Chicago, M. & St. P. R. Co. v. Becker,* 32 Fed. Rep., 854; *Burlington, C. R. & N. R. Co. v. Dey,* 48 N. W. Rep. [Ia.], 98; *Peoria & P. U. R. Co. v. Chicago, R. I. & P. R. Co.,* 109 Ill., 135; *Louisville & N. R. Co. v. Boland,* 18 L. R. A. [Ala.], 260; *Reagan v. Mercantile Trust Co.,* 154 U. S., 418; *San Antonio & A. P. R. Co. v. State,* 79 Tex., 264; *State v. Wabash, St. L. & P. R. Co.,* 83 Mo., 144; *State v. Kansas City, Ft. S. & G. R. Co.,* 32 Fed. Rep., 722; *Smith v. Chicago, M. & St. P. R. Co.,* 53 N. W. Rep. [Ia.], 128; *Vincent v. Chicago & A. R. Co.,* 49 Ill., 33; *People v. Chicago & A. R. Co.,* 55 Ill., 95; *Chicago & A. R. Co. v. Suffern,* 129 Ill., 274; *Hoyt v. Chicago, B. & Q. R. Co.,* 93 Ill., 609; *People v. New York, L. E. & W. R. Co.,* 28 Hun [N. Y.], 549; *Abbott v. Johnstown, G. & K. H. R. Co.,* 80 N. Y., 27; *State v. Hartford & N. H. R. Co.,* 29 Conn., 538; *Covington Stock Yards Co. v. Keith,* 139 U. S., 128; *Wight v. Missouri P. R. Co.,* 20 Mo. App., 481; *Budd v. State of New York,* 143 U. S., 517; *Brass v. State of North Dakota,* 153 U. S., 391; *Thorpe v. Rutland & B. R. Co.,* 27 Vt., 140; *State v. Chicago, B. & Q. R. Co.,* 2 Am. R. & C. Rep. [Neb.], 664; *American Rapid Telegraph Co. v. Hess,* 4 Am. R. & C. Rep. [N. Y.], 199; *Maine v. Grand T. R. Co. of Canada,* 5 Am. R. & C. Rep. [U. S.], 248; *Galena & C. U. R. Co. v. Rae,* 68 Am. Dec. [Ill.], 374.)

*William B. Sterling* and *Lloyd W. Bowers, contra:*

By the act, a railroad is required to engage in the business of transporting freight beyond its own line of road, and so is forced into an occupation which it has never bound itself to enter. Such legislation is a deprivation of liberty and property without due process of law, abridges the immunities guarantied to railroads as to others, and denies them the equal protection of the laws, all in contravention of section 1 of the fourteenth amendment to the constitution of the United States. (*Zabriskie v. Hackensack & N. Y. R. Co.,* 18 N. J. Eq., 178; *Ames v. Lake Superior & M. R. Co.,* 21 Minn., 255; 2 Morawetz, Private Corporations [2d ed.], secs. 1047, 1059; Hutchinson, Carriers [2d ed.], sec. 145; *Kentucky & Indiana Bridge Co. v. Louisville & N. R. Co.,* 37 Fed. Rep., 567; *Atchison, T. & S. F. R. Co. v. Denver & N. O. R. Co.,* 110 U. S., 668.)

The rates fixed by the act for any transportation of freight in the course of which a transfer switch is traversed are unreasonable, and have the effect of taking property without due process of law, in disregard of both the federal and state constitutions. (*Reagan v. Farmers Loan & Trust Co.,* 154 U. S., 362; Black, Constitutional Law, pp. 318, 324, 325; *In re Jacobs,* 98 N. Y., 98; *Toledo, W. & W. R. Co. v. City of Jacksonville,* 67 Ill., 37.)

The right of railroads, under their charters from congress and the state of Nebraska, to charge reasonable rates, is a contract right, and is subject to regulation only by the legislative power of the state in the proper exercise of the police power, and for the purpose and to the extent of preventing unreasonable charges; but the act in question subjects the rates of one railroad to control by other railroads, and places the rates under arbitrary and unreasonable restrictions, thereby impairing the obligation of the contract growing out of the company's charter, and so violating article 1, section 10, of the federal constitution. (3 Am. &

Eng. Ency. Law, 741 ; Black, Constitutional Law, p. 536; Cooley, Constitutional Limitations [5th ed.], p. 712; *Pingry v. Washburn,* 1 Aik. [Vt.], 264; *New Orleans Gas Light Co. v. Lousiana Light & Heat Producing & Mfg. Co.,* 115 U. S., 650.)

The rates fixed by the statute for the transportation of freight in the course of which a transfer switch is traversed are absolute and are conclusively imposed, whether actually reasonable or not. The rates are established finally, instead of being merely declared presumptively reasonable; and under the terms of the statute, judicial inquiry into the actual reasonableness of the rates is immaterial and improper; for this reason, the act takes property without due process of law, and also denies the equal protection of the laws, contrary to the federal and state constitutions. (*Chicago, M. & St. P. R. Co. v. State of Minnesota,* 134 U. S., 418.)

*Wright, Hubbard & Bevington, John B. Hawley,* and *B. T. White,* also for defendants in error.

RYAN, C.

This action was begun in the district court of Holt county, as shown by the prayer of the application for a writ of *mandamus* to compel the defendants to build, forthwith, a transfer or connecting switch at O'Neill, in said county, whereby the lines of the respondent railroad companies might be connected one with the other, and upon completion of said transfer switch to henceforth maintain the same in good condition and to receive and forward freight in car load lots offered by one road to the other offered on or over said transfer switch, and to place in force a joint schedule of rates between stations on the lines of each of said roads whereby freight in car load lots might be carried from a station on one road to a station on the other, which said rates should be for the rate for the shortest mile-

age by any railroad between the point of shipment and the point of destination; or, to show cause, by a day fixed, why said order should not be complied with, and, upon final hearing, that said order be made final, and for such other and further order as might be required and which a full and complete carrying out of the statute set forth in the application aforesaid should demand. It is not necessary to more fully state the nature of this action further than to say that by the application it was shown that the lines of railroad owned and operated by the defendant companies touched each other at O'Neill and at that point each received and delivered freight; that the board of transportation of the state of Nebraska, before the commencement of this action, had found a necessity for a transfer switch between said lines and had duly ordered the same to be constructed, and that the respondents, and each of them, had failed and refused to build and maintain such switch. The right to the relief above prayed was based upon the provisions of chapter 11, Laws, 1893. It is not possible to determine whether or not the connection by transfer switch could have been compelled, under the provisions of section 113, chapter 16, Compiled Statutes, for there are contained in the application no averments showing the existence of prerequisites indispensable under this section. A general demurrer to the petition by each defendant was sustained, and from the judgment of dismissal, thereupon following, plaintiff has prosecuted error proceedings to this court.

The first and second sections of chapter 11, pages 142, 143, Laws, 1893, contain the provisions concerning which most of the arguments in this case have been made. The enacting clause and these sections are in the following language:

" *Be it enacted by the legislature of Nebraska:*

"Section 1. That all railroads touching the same point in this state, at which point such railroads receive and deliver freight, or at some near point, shall build and maintain transfer switches for common use in transferring freight

in car load lots from one such railroad to another, and receive
and forward such freight according to the provisions of this
act; *Provided,* That the railroad interested may apply. to
the state board of transportation to be relieved of this duty,
in any case where its performance is unusually burdensome,
and if, upon a personal examination of the locality where
the transfer switches are to be put in, and taking testimony
of the persons residing in the locality, by the secretaries of
such board, they find it unjust and unreasonable to require
the building of such transfer switches, then such board may
relieve such roads of such duty, and that evidence from any.
locality along the lines of roads interested shall be consid-
ered by said board, and be competent testimony in such
case.

"Sec. 2. That whenever a shipper of freight from any.
point in this state to any other point in this state over two
or more lines of railroads to reach such point of destina-
tion, it shall be the duty of all such railroads as come under
the provisions of this act to receive and deliver all such
freight in car lots, on board cars upon such transfer switch.
The railroad company at point of shipment shall make a
through way bill to point of destination, and the rate to be
charged for such shipment shall not be the sum of two or
more locals, but shall be apportioned between the different
roads according to the mileage of each necessarily used in
such shipment, and shall be the rate for the shortest mile-
age distance by any railroad between point of shipment
and point of destination."

The mandatory requirement of the first section is that
railroad companies, situated as are the defendants, shall
build and maintain transfer switches for transferring car
load lots from one road to the other and receive and for-
ward the same according to the provisions of said act. The
case has been presented on both sides upon the theory that
the clause, "according to the provisions of this act," relates
to and qualifies each antecedent requirement; that is, of

putting in and maintaining the transfer switch as well as of receiving and forwarding freight. In this we think counsel correctly construed these provisions. In view of the fact that at the date of the passage of this act there was already in existence a section of the Compiled Statutes which required the construction of transfer switches, it is very clear that the main purpose of the act under consideration is to be found in its second section. The validity of this act will, therefore, be considered with reference to its chief object as defined in the said second section, rather than with reference to the duty to construct transfer switches,—a matter of minor importance.

In Iowa a transfer switch law was enacted by the legislature, of which some provisions resemble those found in the above act. It is not necessary that these should be copied or described at length, for the argument of the attorney general was based upon analogies sufficiently indicated by an opinion of the supreme court of that state filed in a cited case, to which we shall now refer. In *Smith v. Chicago, M. & St. P. R. Co.*, 53 N. W. Rep. [Ia.], 128, thus confidently relied upon by the plaintiff in error, there were considered but two questions. Of these, the first was whether the state was the proper party plaintiff. The other proposition decided is found correctly stated in the fourth paragraph of the syllabus thus: "Code, section 1292, provides that a railroad corporation whose road intersects or crosses any other line of railway of the same gauge shall connect its road with such other railway so intersected. Act 1878, section 3, provides that the railroad commissioners shall have general supervision of all the railroads in the state and inquire into any neglect or violation of the laws of the state. Acts 20 General Assembly, chapter 24, section 1 provides that corporations having intersecting roads shall, ' whenever ordered by the railroad commissioners,' unite and connect their tracks. Held, that the commissioners should order the connection of such tracks

48

only when they deem it best and need not do so regardless of its advisability." In this case the railroad commissioners had, in effect, found that there was no necessity for the connection sought to be required, but ordered it on the theory that the statute compelled them so to do whether the connection was necessary or not. How the supreme court of Iowa viewed the construction followed by the railroad commissioners is clearly indicated by the language above quoted. In the case just considered, however, there was involved no such question as that which chiefly concerns us in this case. Since we have had brought to our notice the holding of the supreme court of Iowa in one case, it may subserve a useful purpose to note that in *Smith v. Chicago, M. & St. P. R. Co.*, 55 N. W. Rep., [Ia.], 331 another ruling of that court has been made, which is correctly reflected in the following language of the syllabus: "An order of the railroad commissioners that the defendant railroad company transfer cars delivered to it by another company from its station to another point, as a switching service and at switching rates, will not be enforced where such point is beyond the yard limits and the service rendered is on the main line and is done under orders as in case of trains and not under the direction of the yardmaster." The court, in its opinion, said that if the order of the railroad commissioners was to be enforced by a decree, as prayed, such enforcement involved a change in the management of the company as to the classification and operation of its trains, and for this reason a demurrer to the petition containing the prayer above indicated was held to have been properly sustained. Indirectly there was thus considered one of the minor questions to which the law under discussion might naturally give rise; but as this question is not necessarily involved, we shall proceed to consider other questions which cannot be ignored.

It is insisted by the plaintiff in error that section 2 of

the act under consideration is not within the inhibition of the following language of section 1 of the fourteenth amendment of the constitution of the United States, to-wit: "No state shall make or enforce any law which shall abridge the privileges or immunities of the citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law." In the construction of the federal constitution and statutes, state courts must follow the supreme court of the United States. (*Franklin v. Kelly*, 2 Neb., 79; *Bressler v. Wayne County*, 25 Neb., 468.) In delivering the opinion of the court in *Reagan v. Farmers Loan & Trust Co.*, 154 U. S., 362, Mr. Justice Brewer briefly reviewed the history of the adjudications of the United States supreme court respecting legislative control over railroads. As such a review is not inappropriate in the consideration of this case, and as no one is more likely to correctly summarize such history than Judge Brewer, his language is quoted, as follows: "In *Chicago, Burlington & Quincy Railroad v. Iowa*, 94 U. S., 155, and *Peik v. Chicago & Northwestern Railway*, 94 U. S., 164, the question of legislative control over railroads was presented, and it was held that the fixing of rates was not a matter within the absolute discretion of the carriers but was subject to legislative control. As stated by Mr. Justice Miller in *Wabash, etc., Railway v. Illinois*, 118 U. S., 557, 569, in respect to those cases: 'The great question to be decided and which was decided, and which was argued in all those cases, was, the right of the state, within which a railroad company did business, to regulate or limit the amount of any of these traffic charges.' There was in these cases no decision as to the extent of control, but only as to the right of control. This question came again before this court in *Railroad Commission Cases*, 116 U. S., 307, 331, and while the right of control was reaffirmed, a limitation on that right was plainly intimated in the following words of the chief justice: 'From what

has thus been said it is not to be inferred that this power of limitation or regulation is itself without limit. This power to regulate is not a power to destroy, and limitation is not the equivalent of confiscation. Under pretense of regulating fares and freights the state cannot require a railroad corporation to carry persons or property without reward; neither can it do that which in law amounts to the taking of private property for public use without just compensation, or without due process of law.' This language was quoted in the subsequent case of *Dow v. Beidelman,* 125 U. S., 680, 689. Again, in *Chicago, Milwaukee & St. Paul Railway v. Minnesota,* 134 U. S., 418, 458, it was said by Mr. Justice Blatchford, speaking for the majority of the court: 'The question of the reasonableness of a rate of charge for transportation by a railroad company, involving as it does the element of reasonableness, both as regards the company and as regards the public, is eminently a question for judicial investigation, requiring the process of law for its determination.' And in *Chicago & Grand Trunk Railway v. Wellman,* 143 U. S., 339, 344, is this declaration of law: 'The legislature has power to fix rates, and the extent of judicial interference is protection against unreasonable rates.' *Budd v. New York,* 143 U. S., 517, announces nothing to the contrary. The question there was not whether the rates were reasonable, but whether the business, that of elevating grain, was within legislative control as to the matter of rates. It was said in the opinion: 'In the cases before us the records do not show that the charges fixed by the statute are unreasonable.' Hence, there was no occasion for saying anything as to the power or duty of the courts in case the rates as established had been found to be unreasonable. It was enough that upon examination it appeared that there was no evidence upon which it could be adjudged that the rates were in fact open to objection on that ground."

Commenting upon the principles involved in the cases

which he had just reviewed Mr. Justice Brewer said : " It has always been a part of the judicial function to determine whether the act of one party (whether that party be a single individual, an organized body, or the public as a whole) operates to divest the other party of any rights of person or property. In every constitution is the guaranty against the taking of private property for public purposes without just compensation. The equal protection of the laws, which, by the fourteenth amendment, no state can deny to the individual, forbids legislation, in whatever form it may be enacted, by which the property of one individual is, without compensation, wrested from him for the benefit of another, or of the public. This, as has been often observed, is a government of law, and not a government of men, and it must never be forgotten that under such a government, with its constitutional limits and guaranties, the forms of the law and the machinery of government, with all their reach and power, must in their actual workings stop on the hither side of the unnecessary and uncompensated taking or destruction of any private property, legally acquired and legally held."

In *Chicago, M. & St. P. R. Co. v. Minnesota,* referred to in the above review of cases by Judge Brewer, the restrictions just referred to were applied to such facts and in such a manner as to illustrate their inhibitory force. In that case there was under consideration a law of Minnesota which empowered a commission to prescribe rates for the transportation of freight upon the several railroad lines in that state. Upon a failure of any railroad company to comply, within a fixed time, with the rate established by such commission, the commission was empowered by law to post such rate, which, thereupon, became as binding upon the railroad company concerned as though adopted and promulgated by its authority. Under the provisions of this law the supreme court of Minnesota had held that the rates thus published were the only ones that were law-

ful, and that therefore, in contemplation of law, the only
ones that were equal and reasonable, and hence that, in a
proceeding by *mandamus* to compel a railroad company to
comply with this rate, there was no fact to traverse, except
the alleged violation of the law in refusing compliance
with the recommendations of the commission. In deliv-
ering the opinion of the majority of the supreme court of the
United States, Mr. Justice Blatchford said : " This being
the construction of the statute by which we are bound in
considering the present case, we are of the opinion that, so
construed, it conflicts with the constitution of the United
States in the particulars complained of by the railroad com-
pany. It deprives the company of its right to a judicial
investigation, by due process of law, under the forms and
with the machinery provided by the wisdom of successive
ages for the investigation, judicially, of the truth of a mat-
ter in controversy, and substitutes therefor, as an absolute
finality, the action of a railroad commission, which, in view
of the powers conceded to it by the state court, cannot be
regarded as clothed with judicial functions or possessing the
machinery of a court of justice." That the rates referred
to in the foregoing quotation were fixed by a commission
to which that power had been delegated by the legisla-
ture of Minnesota, in principle, was the same as though
the legislature itself had exercised that power, for the lat-
ter could not delegate to the former a power not possessed
by itself. Considered independently of the entirely fortui-
tous circumstance that the commission had fixed the rates,
the majority of the supreme court of the United States, in
effect, held in *Chicago, M. & St. P. R. Co. v. Minnesota*,
that it was not within the power of the legislature to pro-
vide, as an absolute finality, that only certain fixed rates
could be charged by railroad companies for the transporta-
tion of freight. In the subsequently decided case of *Rea-
gan v. Farmers Loan & Trust Co., supra,* the entire court
seems to have assented to the correctness of the following

proposition therein quoted from the majority opinion in *Chicago, M. & St. P. R. Co. v. Minnesota*, to-wit: "The question of the reasonableness of a rate of charge for transportation by a railroad company, involving as it does the element of reasonableness, both as regards the company and as regards the public, is eminently a question for judicial investigation, requiring due process of law for its determination." As this seems unquestionably to be the conclusion established by the able review of the cases which has been hereinbefore quoted from *Reagan v. Farmers Loan & Trust Co.*, it should be accepted as such an authoritative construction of the part of the fourteenth amendment which is involved in this case that it must bind this court, whatever its views independently of this construction might have been.

In view of this construction by the supreme court of the United States placed upon the part of the fourteenth amendment with which we are now concerned, let us consider some of the provisions of the second section of the act entitled "An act to regulate railroads and to compel them to put in transfer switches," the same being chapter 11, Laws, 1893. The first sentence of this section is imperfect, but its evident meaning is that where freight shall be shipped over two or more lines of railroad, between points in this state, it shall be the duty of all such railroads to receive and deliver such freight in car lots, on board cars upon such transfer switch as connects their lines. By this section it is furthermore required that the railroad company at the point of shipment shall make a through way bill to the point of destination, the rate for the shipment not to be the sum of two or more locals, but for the shortest mileage distance by any railroad between the point of shipment and the point of destination. For the sake of illustration, let us suppose that a triangle is formed by three distinct lines of railroad within this state; that of each of two of these lines the length is one hundred miles and that the length

of the line on the third side is twenty-five miles.   A ship-
per of a ton of hard coal, we will suppose, directs that his
coal be sent from the intersection of the short line with one
of the longer lines over both of the longer lines to the
point at which such coal shall reach the extremity of the
short line furthest from the initial point of shipment.   It
will thus be required to travel two hundred miles to reach
its destination.   It might have done so by traveling twenty-
five miles.   Chapter 24, Laws, 1893, has been held in
*Ames v. Union P. R. Co.*, 64 Fed. Rep., 165, to have fixed
inadequate rates, and the enforcement of this statute is now
suspended by injunction; nevertheless we shall assume, for
the mere purposes of illustration, that these rates afford as
fair a basis between themselves for comparisons as any
other that could be found.   For hauling 2,000 pounds of
hard coal a railroad company, under this maximum rate
law, was permitted to charge for a distance of twenty-five
miles the sum of seventy-six cents; for hauling the same
ton of coal two hundred miles there might be required as
compensation the sum of two dollars.   It may be ob-
jected that this case is merely hypothetical, and that, prac-
tically, this supposed condition is impossible.   Let us, there-
fore, suppose that a dealer finds it necessary to send a car
load of hard coal from Omaha to Plattsmouth.   For some
reason, perhaps to avoid the payment of drayage charges,
he elects to send the coal by way of Columbus, and, as he
has the right under this law, he requires it billed over the
Union Pacific railway to Columbus and thence over the
Burlington & Missouri railway to Plattsmouth.   There is
by this route required to be traveled ninety-one miles over
the line of the first named railway and one hundred and
thirty miles over the other—in all two hundred and twenty-
one miles.   The same shipment might be made by the Mis-
souri Pacific railway, in which case the haul would be but
twenty-six miles.   Referring again to the maximum rate
law for what may be assumed to be relatively fair rates, at

least in the judgment of the legislature which passed the
act under consideration, we find that the rate for twenty-
five miles, the rate nearest approximating that for the dis-
tance between Omaha and Plattsmouth by a direct line (as
stated in the first illustration) is seventy-six cents per ton,
while by the lines in fact traveled, had they been in fact
exactly two hundred and twenty miles, the rate would be
two dollars and twenty cents per ton, that is one dollar and
forty-four cents in excess of what could have been charged
over the shortest available route, and these are but fair
illustrations of the practical results brought about by chap-
ter 11, Laws of 1893, and apparently, that there may be
no means of avoiding this result, this law forbids any
charges to be made for transfer switching.    Even the rea-
sonableness of the charge for transporting over the short
line the supreme court of the United States, as we have
already seen, has held is a question for judicial investiga-
tion, requiring the process of law for its determination.
If, as was held in *Chicago, M. & St. P. R. Co. v. Minne-
sota*, the establishment of an arbitrary rate which deprived
the railroad company of its right to a judicial investigation
by due process of law under the forms and with the ma-
chinery provided for the investigation judicially of the
truth of the matter in controversy, and the substitution
therefor as an absolute finality of the action of a commis-
sion not clothed with judicial functions or possessed of the
machinery of a court of justice, was in conflict with the
constitution of the United States, there is no escape from
the conclusion that a law which, as a finality, establishes a
rate dependent, not upon the length of a haul by the route
chosen by the shipper of freight, but by the length of a
much shorter route of which he refuses to avail himself, is
open to the same objection.    No argument can be made to
sustain this law, which equally would not tend to sustain
those under which the supreme court of the United States
held invalid the rates established by commissioners in Min-

nesota, and other rates fixed in a similar manner in Texas. This law, in addition to the objections held sufficient as against the statutory regulations of rates in Minnesota and Texas, is subject to the criticism that no railroad company can know, in advance, for what compensation it may be required to haul freights over its line. There is, therefore, no way by which we can escape the logical result of these conditions authoritatively declared by the supreme court of the United States sufficient to vitiate other legislative enactments in which but a portion of the objectionable features of the statute under consideration was embodied. The attempt to establish rates of compensation, as was done in chapter 11, Laws, 1893, must therefore be held to be in violation of the provisions of the fourteenth amendment and therefore to be nugatory.

It is, however, insisted by the plaintiff in error that, independently of legislative establishment of rates, it lies within the power of courts to define what rate over connecting lines is reasonable, and to enforce its observance. This question, too, has received the attention of courts and always, we believe, with the result reached in the cases we shall now review.

In *Paxton & Hershey Irrigating Canal & Land Co. v. Farmers & Merchants Irrigation Canal & Land Co.*, 45 Neb., 884, Judge Post, for this court, said: "It was at the consultation suggested that it is within the power of a court of equity to prescribe the conditions upon which one irrigating company may connect with the ditch of another; but that assertion rests, to say the least, upon doubtful grounds. Conceding irrigating companies as *quasi*-public corporations, to be subject to the strict obligations of common carriers, it does not follow that they may, by the courts, be compelled to enter into particular agreements or assume particular relations, however just and equitable, towards each other. That subject has recently engaged the attention of the supreme court of the United States, by

which the power to prescribe terms for the interchange of business by connecting carriers is declared to be rather legislative than judicial in character, notwithstanding the provisions of the interstate commerce act. (*Atchison, T. & S. F. R. Co. v. Denver & N. O. R. Co.* 110 U. S., 667; *Pullman Palace Car Co. v. Missouri P. R. Co.*, 115 U. S., 587; *Express Cases*, 117 U. S., 1; *Little Rock & M. R. Co. v. St. Louis, I. M. & S. R. Co.*, 41 Fed. Rep., 559. See, also, Beach, Private Corporations, 839; *Kentucky & Indiana Bridge Co. v. Louisville & N. R. Co.*, 37 Fed. Rep., 567.) Such of these citations as refer to cases determined by the supreme court of the United States we shall now consider at such length as shall be profitable.

In *Atchison, T. & S. F. R. Co. v. Denver & N. O. R. Co.*, *supra*, Waite, C. J., delivering the opinion of the court, said: "A connection of roads may make a connection in business convenient and desirable, but the one does not necessarily carry with it the other." Later in this opinion he said that it was not the law that every railroad company which forces a connection of its road with that of another company has a right under the constitution of Colorado, or at the common law, to require the company with which it connected to do a connecting business at the junction, if it does a similar business with any other company under any other circumstances. This, he said, might be made the law by the legislative department of the government, but it did not follow as a necessary consequence from the constitutional right of a mechanical union of tracks, or from the said constitutional prohibition against undue or unreasonable discrimination in facilities.

In *Pullman Palace Car Co. v. Missouri P. R. Co.*, *supra*, it was sought to compel the use of the cars of plaintiff over the line of the St. Louis, Iron Mountain & Southern Railway Company, though that company had been consolidated with the Missouri Pacific Railway Company. Waite, C. J., in the opinion delivered by him for the court in this case,

said: "The business [of the sleeping car company] is always done under special written contracts. These contracts must necessarily vary according to the special circumstances of each particular case. Certainly, it cannot be claimed that a court of chancery is competent to require these companies to enter into such a contract for the furnishing and hauling of the Pullman cars, as the court may deem reasonable. A mere statement of the proposition is sufficient to show that it is untenable."

In the *Express Cases, supra,* the circuit court had required by its decree that the railroad companies which were defendants should, as common carriers, afford each express company certain facilities for the transaction of its business as a common carrier, the character of such facilities to be the same as by virtue of a contract formerly in existence it had been the duty of each railroad company to provide. By this decree the rate of compensation to be paid had been fixed at not exceeding fifty per cent more than the railroad company's prescribed rate for the transportation of ordinary freight, and not greater than the railroad company would charge for the transportation of express matter on its own account, or for any other express or other corporation, or for private individuals, and a bond was required to secure such payment. The right of each party to apply for a modification of this decree under the rules in equity proceedings had been reserved by the decree itself as to the measure of compensation prescribed. In the opinion of a majority of the court, delivered by Waite, C. J., the following language was used: " The difficulty in the cases is apparent from the form of the decrees. As express companies had always been carried by railroad companies under special contracts which established the duty of the railroad company upon the one side, and fixed the liability of the express company on the other, the court, in decreeing the carriage, was substantially compelled to make for the parties such a contract for the business as, in its

opinion, they ought to have made for themselves.   Having found that the railroad company should furnish the express company with facilities for business, it had to define what these facilities must be, and it did so by declaring that they should be furnished to the same extent, and upon the same trains, that the company accorded to itself or to any other company engaged in conducting an express business on its line.   It then prescribed the time and manner of making the payment for the facilities and how the payment should be secured, as well as how it should be measured.   Thus, by the decrees, these railroad companies are compelled to carry these express companies at these rates, and on these terms, so long as they ask to be carried, no matter what other express companies pay for the same facilities or what such facilities may, for the time being, be reasonably worth, unless the court sees fit, under the power reserved for that purpose, on the application of either of the parties, to change the measure of compensation.   In this way, as it seems to us, 'the court has made an arrangement for the business intercourse of these companies, such as, in its opinion, they ought to have made for themselves,' and that, we said in *Atchison, Topeka & Sante Fe Railroad Co. v. Denver & New Orleans Railroad Co.*, 110 U. S., 667, followed at this term in *Pullman Palace Car Co. v. Missouri Pacific Railway Co.*, 115 U. S., 587, could not be done. The regulation of matters of this kind is legislative in its character, not judicial.   To what extent it must come, if it comes at all, from congress, and to what extent it may come from the states, are questions we do not now undertake to decide; but that it must come, when it does come, from some source of legislative power, we do not doubt. The legislature may impose a duty, and when imposed it will, if necessary, be enforced by the courts, but unless a duty has been created either by usage, or by contract, or by statute, the courts cannot be called on to give it effect."

The other citations in *Paxton & Hershey Irrigating Canal*

*& Land Co. v. Farmers & Merchants Irrigation & Land Co., supra,* need not be considered at length, for while inferior in authority, they follow the same line as do the cases above reviewed. The same doctrine was recognized in *Reagan v. Farmers Loan & Trust Co.,* 154 U. S., 362.

Among the cases cited by the plaintiff in error is *Texas Express Co. v. Texas & P. R. Co.,* 6 Fed. Rep., 437, determined in the circuit court of the United States for the northern district of Texas, in which case it was said: "If it is practicable to define express matter with reasonable certainty, and to fix by law maximum rates for its carriage, it is most clearly not within the province of the judicial department of the government to do this. When and how far it may become necessary or expedient to do so must be left to the legislature to determine and declare, and until the legislature does so provide, the parties hereto, and all others similarly circumstanced, must be remitted to their right and power to contract in reference to the compensation for such service, subject to the limitations placed upon defendants by their duties as exclusive public carriers on public highways, that their terms for carrying shall be reasonable and such as involve no unjust discrimination, to be determined in each particular case by the agreement of the parties in interest, and, in case of their failing to agree, to be determined by the proper court on full statement and proof of the particular case." The language of the latter part of the above quotation is relied upon by the attorney general to sustain the proposition that if the provisions of the statute cannot be upheld, this court may supply the deficiency, and, separated from its context, this part of the quotation, doubtless, tends strongly in that direction. This part of the quotation, however, is greatly qualified when we take into account that immediately preceding this portion favorable to the contention of the plaintiff in error it was said : "If it is practicable to define express matter with reasonable certainty, and to fix by law maximum rates for

its carriage, it is most clearly not within the province of the judicial department of the government to do this."

From this review of the federal decisions with reference to this subject-matter it is clear that it does not lie within the power of courts to formulate contracts whereby shall be regulated the rights and duties of parties concerned, even though each of such parties is a common carrier. The practical difficulties which in the *Express Cases* surrounded, and in the judgment of the supreme court of the United States rendered futile, the attempt of the circuit court to define the duties of the express companies on the one hand, and the railroad companies on the other, apply with still greater force to the case at bar. In the *Express Cases* there were on either side the proposed parties to a contract relation which was to exist for a considerable space of time in the future and all these parties were in court. Between themselves, they had formerly been able, without difficulty, to make a contract which the circuit court believed sufficiently furnished analogies for all the points to be adjusted. In the case at bar the only criterion furnished for the adjustment of rates is that no more shall be charged for such haul as, by the election of the shipper, shall be made necessary, than that it must not exceed the cost of shipment by the shortest route possible. In this case there was before the district court no party interested in shipments other than the carrier, the parties who it was assumed propose to ship were unnamed and unknown, and there was no attempt to suggest the points between which shipment should be made or the compensation therefor which should be established. If it was impossible for the circuit court in the *Express Cases* practically to solve the problem with which it was confronted, there can be no question as to the futility of every effort of this or any other court to formulate rules or rates in compliance with the uncertain requirements of section 2 of chapter 11 of the Laws of 1893. The district court, therefore, very properly declined attempting the per-

formance of this hopeless task.   There has been suggested
no method by which the act under consideration can be
put into effect which has not already been considered, and in
justice to the attorney general it is but fair to say that, to
sustain the provisions of this act, he has advanced every
available argument and consideration which in our opinion
is even plausible.   The judgment of the district court is

AFFIRMED.