## ST. LOUIS, *Plaintiff in Error*, v. DORR *et al.*

### In Banc, July 6, 1898.*

1. **Cities:** RESTRICTION OF AVOCATIONS. An ordinance providing that the houses fronting on a certain street "shall be used for residences only, and no business avocation whatever shall be allowed to be followed in the same," imposes such restrictions upon the ownership of private property that it can not be upheld as a proper exercise of a municipality's general power to regulate the use of its streets.

2. ————: ————: STATUTE APPLICABLE TO CITIES OF THREE HUNDRED THOUSAND: UNCONSTITUTIONAL. A statute which authorizes "all cities having a population of three hundred thousand inhabitants or more" to exclude by ordinance "any business avocation" on certain boulevards, is unconstitutional, because it divides cities of the "first class" into two classes, namely, such as have one hundred thousand inhabitants and less than three hundred thousand, and such as have three hundred thousand population or over, and confers on some cities of a constitutional class powers not possessed by smaller cities of the same class.

3. ————: ————: ————: ————: AS TO ST. LOUIS. Nor can such statute be upheld on the theory that it is an amendment to the charter of St. Louis.

4. **St. Louis:** CHARTER: AMENDMENT. The method of direct amendment of the charter of St. Louis is ordained by section 22 thereof, and that method is exclusive.

5. ————: ————: AUTHORITY OF LEGISLATIVE ACTS OVER. The legislative power of the State may properly be exercised over the city of St. Louis (notwithstanding its charter) in respect of all those topics which involve the relations of the city to the State. Besides, the General Assembly has power to legislate for St. Louis in the full exercise of the police powers of the State, to enforce direct mandates of the fundamental law by appropriate statutes, and to pass all proper laws that are general throughout the State.

6. ————: ————: ————. The charter of St. Louis is subject to the legislative power of the State to the same degree that other cities and counties are.

---

*NOTE.—Decided January 29, 1898; motion for rehearing filed, and denied July 6, 1898.

*Error to St. Louis Court of Criminal Correction.*—HON.
JAMES R. CLAIBORNE, Judge.

AFFIRMED.

*W. C. Marshall* for plaintiff in error.

(1) This being a constitutional question, the
subject is open to examination notwithstanding the
decision in the case of *Murnane v. St. Louis*, 123 Mo.
479; *Railroad v. Morgan Co. Ct.*, 53 Mo. 156. (2) The
decision in *Murnane v. St. Louis* is erroneous. (3) The
boulevard law is constitutional. (4) At the outset it is
proper to bear in mind that there is no city in the State
of Missouri organized under the laws of this State in
reference to cities of the first class, and comparatively
few cities in the State that have been organized under
the Cities, Towns and Villages act, passed by the Gen-
eral Assembly of Missouri after the adoption of the
Constitution of 1875. Nearly every large city in this
State is organized under a special charter. Pursuant
to the direction of section 7 of article IX, the General
Assembly, by the act of 1877 (acts 1877, p. 42), divided
the cities of the State into four classes, to wit: First
class, one hundred thousand inhabitants or more; sec-
ond class, twenty thousand and less than one hundred
thousand; third class, five thousand and less than
twenty thousand; fourth class, five hundred and less
than five thousand. This classification remained until
the adoption of the Revised Statutes of 1889, when, by
sections 972, 973, 974 and 975, the classification was
changed. The court admits that there is another group
of cities in the State, to wit: Cities organized under
special charters existing when the Constitution took
effect. The court, however, does not notice that sec-
tion 16 of article IX, authorizes another class, to wit:

Cities having a population of more than one hundred thousand inhabitants, and that sections 20 to 25, of article IX, authorize a distinct class to wit: St. Louis, by name, and that section 18 of article IX, creates another class, to wit: Cities having more than two hundred thousand inhabitants, by prohibiting any person from holding a state office and a city office at the same time.    Thus, if the act of the legislature in dividing the cities into four classes carried out the commands of section 7 of article IX, there would still be four other classes of cities specially authorized by the Constitution of the State, so that under this interpretation we would have eight classes of cities as follows: *First.*    Cities of over one hundred thousand.    *Second.* Cities of thirty thousand and less than one hundred thousand.    *Third.*    Cities of three thousand and less than thirty thousand.    *Fourth.*    Cities of five hundred and less than three thousand.    *Fifth.*    Cities organized under special charters existing when the Constitution took effect.    *Sixth.*    Cities of over one hundred thousand organized under section 16.    *Seventh.*    The city of St. Louis.    *Eighth.*    Cities of two hundred thousand regulated by section 18.    All of these cities are recognized in the same article of the Constitution, and the various sections authorizing their existence must be construed together.  (5)  This act is general.  It applies to every city that now has or may hereafter attain a population of three hundred thousand inhabitants.    It is in no sense an amendment of the charter of the city with reference to a purely municipal matter.    It is not obligatory upon any city.  It is purely an enabling act. (6)  It is not true under our form of government, especially in large cities, that every man has a right to use his property in any manner he sees fit.  He has a qualified right only.  His right to use his own is always limited by the consideration that he shall not so use his own

as to injure the property of other people.   A man who builds a livery stable or a rendering establishment, or opens a quarry, or builds a business house on his own land, may benefit himself, but in the doing he may inflict irreparable injury upon his neighbors, and he has no right to do so.

*I. H. Lionberger* and *Louis A. Steber* for defendants in error.

(1) Article IV, section 53 of the Constitution prohibits the General Assembly from passing any local or special law regulating the affairs of cities.   The act of 1891 is a local and special law notwithstanding that it applies to all cities having three hundred thousand people and over.   *State v. Hammer*, 42 N. J. 440; *State v. Miller*, 100 Mo. 448; *Murnane v. St. Louis*, 123 Mo. 491. (2) Section 53 of article IV of the Constitution prohibits the General Assembly from passing any local or special law changing the charter of an incorporated city. (3) Section 7 of article IX requires the General Assembly to provide by general law for the organization and classification of cities and towns into not more than four classes and to confer the same powers and impose the same restrictions on all cities of the same class.   St. Louis is a city of the first class under this definition.   The legislature has no power by the act of 1891 to confer upon it alone, of the cities containing one hundred thousand or more inhabitants, the power to establish boulevards, etc.   *Murnane v. St. Louis*, 123 Mo. 489; *Kansas City v. Scarritt*, 127 Mo. 651.   (4)   Sections 20 and 22 of article IX of the Constitution authorize the city of St. Louis to adopt a charter which can be amended by a vote of the qualified voters of the city only.   The act of 1891 amends the charter adopted by the city in a matter of

purely local concern without the consent of the voters of the city, and impairs the local autonomy intended to be conferred. *Kansas City v. Scarritt*, 127 Mo. 650. (5) Section 31 of article II of the Constitution provides that private property shall not be taken or damaged for public use without compensation. The act of 1891 prohibits the use of property abutting on a boulevard for a lawful business purpose, and to that extent impairs its value for the benefit of the public, without compensation to the owner. *St. Louis v. Hill*, 116 Mo. 527.

BARCLAY, C. J.—In March, 1894, the city of St. Louis began an action in a police court against the defendants, Messrs. Dorr and Zeller, to recover a penalty for violation of a municipal ordinance. In the police court the defendants were adjudged not guilty. The city took an appeal to the St. Louis Court of Criminal Correction where the. trial now under review took place.

The substance of the charge against defendants is that they carry on the business of confectioners in a building (No. 3924) on Washington boulevard, contrary to said ordinance. The ordinance was enacted in 1892. It declares a certain portion of Washington avenue to be a boulevard, and, among other provisions regulating the use of that thoroughfare, provides that "the houses fronting or bordering on Washington boulevard, between Grand avenue and Kingshighway, shall be used as residences only, and no business avocations whatever shall be allowed to be followed in same."

It appears from the record that on March 15, 1894 (and on divers days immediately prior thereto) the defendants were carrying on the interdicted avocation at the place mentioned. They had previously conducted

a confectionery business on Vandeventer avenue, just east of their store on Washington boulevard.

Defendants' counsel at the trial admitted the material facts charged. The defense is that the ordinance is unconstitutional. The trial court sustained that defense and entered judgment for defendants. The city (after the necessary steps) brought the case to the Supreme Court by writ of error. It was heard in the second division which entered an order transferring the case to the Court *in banc*, June 8, 1897. It has since been argued and submitted to the whole court.

1. The claim of the city is that the ordinance is authorized by "An Act *relating to boulevards in cities having a population of* 300,000 inhabitants *or more.*" Laws, 1891, p. 47.

The first section of that Act is as follows:

"Section 1. All cities in Missouri having a population of three hundred thousand inhabitants or more, or which shall hereafter reach said population, are hereby authorized and empowered to establish by ordinance boulevards and provide for maintaining the same; and may regulate the traffic thereon, and may exclude heavy driving thereon, or any kind of vehicle therefrom, and may exclude the institution and maintenance of any business avocation on the property fronting on such boulevard and may establish a building line to which all buildings and structures thereon shall conform, and may convert existing streets into boulevards, and may levy a special tax on property fronting on said boulevards, to light, sweep and maintain the same, and the grass and trees thereon, or any part of said expenditures, and for the above purposes, or any of them, may lay out a district or districts in which said special tax shall be levied, and provide for the assessment of said special tax, by assessing the same in favor of the city on the adjoining property fronting

or bordering on the boulevards where such light-
ing, sweeping and maintenance is to be had, in the
proportion that the linear feet of each lot front-
ing or bordering on the boulevard bears to the total
number of linear feet of all property chargeable with
the special tax aforesaid in the district so established,
and may accept dedication, of boulevards with condi-
tions thereto attached which shall be binding and con-
clusive:    *Provided, however*, that no ordinance on the
above subjects, or any of them, shall be valid unless
recommended by the board of public improvements of
the city enacting the same.''

(The other sections of the Act need not be quoted.)

It is not pretended that there is any other specific
authority by which the city of St. Louis is empowered
to exclude such a business avocation as that of the de-
fendants from property fronting on, or adjacent to, any
public street.    Without a clear grant of such power no
municipal ordinance (of the sort invoked in this case)
could possibly be sustained.    Such a restriction as the
ordinance imposes upon the ownership of private prop-
erty could certainly not be supported as a proper exer-
cise of mere general power to regulate the use of streets,
or under any express power to which we have been
cited in the St. Louis charter.    If the Act of 1891, re-
lating to boulevards in cities having a population of
300,000 inhabitants or more, is not valid as an amend-
ment of the said charter, the ordinance at the founda-
tion of this action is unauthorized (at least so far as
concerns the charge against defendants).    Being of the
opinion that the said boulevard Act does not of itself
operate to alter the existing charter of the city of St.
Louis, we hold said ordinance void, as applied to the
facts of defendants' case.

2.    The Constitution of 1875 prohibits the passage
of any local or special law ''authorizing the laying out,

opening, altering or maintaining roads, highways, streets or alleys," or "incorporating cities, towns or villages, or changing their charters." (Art. IV, sec. 53).

It is further provided in the ninth article as follows:—

"Sec. 7. The General Assembly shall provide, by general laws, for the organization and classification of cities and towns. The number of such classes shall not exceed four; and the power of each class shall be defined by general laws, so that all such municipal corporations of the same class shall possess the same powers and be subject to the same restrictions. The General Assembly shall also make provisions, by general law, whereby any city, town or village, existing by virtue of any special or local law, may elect to become subject to, and be governed by, the general laws relating to such corporations."

The scope and intent of the section just quoted have been recently described in a learned opinion of Judge PHILIPS, in a Missouri case in the United States Circuit Court.

"This provision of the Constitution is both mandatory and prohibitory. Its command is not only that the legislature shall provide for the organization and classification of all cities in the State, but such provision must be by general laws, not special enactments. It then commands the classification of such cities, and interdicts the creation of more than four classes. It further commands, not only that the legislature shall define the restrictions and powers of each of said classes, but also that this shall be done by general law. It then proceeds to declare the purpose of the convention in making this requirement to be 'so that all such municipal corporations of the same class shall possess the same powers and be subject to the same restrictions.' The clear intent of which is to prevent the multiplica-

tion of classes of municipalities, and the giving to one within the same class different powers and functions, and imposing upon any one restrictions different from those in the same class or division. In short, it is to secure absolute uniformity, by general law, applicable to all the given classes, respecting the faculties with which they might be endowed, and the limitations placed upon their functions by the legislature; so that any person, anywhere, desiring to ascertain what are the powers and restrictions of any one city of a given class in the State, could be advised thereof by looking at the 'general law' defining such powers and restrictions." *Ward v. Boyd Paving Co.* (1897) 79 Fed. 391, affirmed (1898) 85 Fed. 27, in a well considered judgment of Judge SANBORN.

The legislature of Missouri has enacted general laws for the organization of four classes of cities and towns under legislative charters. R. S. 1889, secs. 972-977. The first class comprises cities of 100,000 inhabitants and over. For cities of that size, choosing to adopt it, a charter is provided in substantially the same terms as those of the original freeholders charter of St. Louis (R. S. 1889, secs. 984-1236).

If the boulevard Act of 1891 is entitled to any standing as a general law it is on the theory that the Act is applicable to all cities that may in time possess the population stated. The Act then will necessarily have the effect to enlarge the powers of all cities of the first class when they reach a population of 300,000, leaving the smaller cities of that class without those enlarged powers. Thus the first class of cities with general charters would be divided into two classes, and there would exist at least five classes of legislative charters, in violation of section 7 above quoted, and especially in violation of that part of it which declares that "the power of each class shall be defined by gen-

eral laws, so that all such municipal corporations of the same class shall possess the same powers and be subject to the same restrictions." That part of the Constitution forms an impregnable obstacle against such enactments as this.

The section just quoted was designed to put an end to special legislation (however disguised) in relation to the municipal powers of cities and towns that might accept the classified charters applicable to them. The reason for so positive a command on that point was briefly given in the address which accompanied the new Constitution when first promulgated:

"Cities and Towns. Charters of cities and towns must be amended by general law. The advantages of this must be apparent. To illustrate: a single law will suffice for all cities and towns of the same class in the State: whereas now a separate law must be passed for every city. Legislation in the interest of individuals and cliques will be prevented, for while it is easy to procure the passage of an unjust law affecting but a single locality, in which none but the immediate representatives are interested, it would be difficult to procure the passage of a similar law affecting all localities of the same class."

But whatever the reason for the constitutional mandate its purpose to prohibit the enactment of legislative charters for more than four classes of cities is sufficiently clear to demand enforcement. Fortunately its language is so plain as to be more difficult of evasion than some other parts of the organic law have proven to be.

Conceding then (for argument) that the boulevard Act before us is in form a general law (because it may apply to all cities that in future reach the prescribed size) it is yet unconstitutional because it would add another class to the four classes of legislative

charters already existing, and would confer on some cities of the first class (on reaching the population of 300,000) municipal powers not possessed by smaller cities of the same class. *Worcester Nat. Bank v. Cheney* (1880) 94 Ill. 430; *Denman v. Broderick* (1886) 111 Cal. 96 (43 Pac. Rep. 516).

3.   But it is contended that the boulevard Act is at least valid as an amendment to the charter of St. Louis, and that, as such an amendment, it is not within the intention of the seventh section of the ninth article of the Constitution in its prohibition of more than four general classes of city or town charters.

Waiving now all question whether such a narrowing of the application of the boulevard Act is permissible (considering its title and its terms) let us examine the merits of the contention. They involve the construction of those provisions of the organic law under which the present charter of St. Louis came into operation. Those provisions are familiar to all who have had occasion to examine into the relations of that city to the State. They form the concluding part of the ninth article of the Constitution, and begin with the twentieth section.

St. Louis was not alone in obtaining the privilege of framing a charter for its own government. By the sixteenth and seventeenth sections of the same article all cities having a population of more than 100,000 inhabitants were accorded a similar right. Kansas City has availed itself thereof, and is governed now by a charter prepared by its freeholders and adopted by its own citizens in 1889.

An Act of the General Assembly was passed in 1893 purporting to empower "every city in this State which is now or may hereafter be organized under and by virtue of the provisions of section 16, article 9 of the Constitution of this State, to establish and maintain

for such city a system of parks and boulevards," etc.
But the Supreme Court *in banc* held that Act uncon-
stitutional,. and declared that, so far as concerns the
local affairs of Kansas City, its present charter can not
be amended by an act of the legislature. *Kansas City
ex rel. v. Scarritt* (1895) 127 Mo. 642 (29 S. W. Rep.
845 and 30 S. W. Rep. 111) followed in *Kansas City v.
Ward* (1896) 134 Mo. 172 (35 S. W. Rep. 600) and
*Kansas City v. Marsh Oil Co.* (1897) 140 Mo. 458 (41
S. W. Rep. 943).

The correctness of that ruling is admitted in this
case by the learned counsel for St. Louis, whose brief
states "that the charter of Kansas City can not be
amended as to local matters by an act of the legislature
or in any other way than by vote of the people," and
that "as to special matters, therefore, Kansas City will,
under this ruling, always have her own rule for the im-
provement of her streets, which will be different from
the rule in other cities." But he, nevertheless, insists
that "St. Louis, under section 25 of article 9, may be
affected by a general act amending her charter."

Let us inquire why the charter of St. Louis should
be considered subject to amendment by the legislature,
as to matters of municipal and local concern, while the
charter of Kansas City and others framed under section
16 are to be exempt from such amendment.

Section 16 provides that the freeholders' charter
adopted under it "may be amended" (after certain pre-
liminaries) by a vote of the people of the city, "and not
otherwise." Section 22 provides that the St. Louis char-
ter "may be amended at intervals of not less than two
years," by proposals submitted to, and accepted by, a
certain part of the qualified voters of the city. But the
words "and not otherwise" (occurring in section 16)
are wanting in section 22. As to each kind of charter
and amendments thereof it is expressly provided that

they "shall always be in harmony with and subject to the Constitution and laws" of the State. At the close of the article is the further declaration that "Notwithstanding the provisions of this article, the General Assembly shall have the same power over the city and county of St. Louis that it has over other cities and counties of this State" (sec. 25).

The section last quoted was probably inserted out of abundant caution to indicate that the scheme and charter for the reorganization of the city and county governments of St. Louis were not to be construed to impair the power of the General Assembly to legislate for that city and for St. Louis county to the same extent that other cities and counties of the State were subject to that power. Section 25 does not refer to any distinction between local and other subjects of legislation; but sections 20 and 23 indicate that distinction quite clearly.

Section 20 moreover describes, in very significant terms, the legal force of the scheme and charter when duly ratified, viz: "then such scheme shall become the organic law of the county and city, and such charter the organic law of the city, and at the end of sixty days threafter shall take the place of and supersede the charter of St. Louis, and all amendments thereof, and all special laws relating to St. Louis county inconsistent with such scheme."

"Organic law" is a term usually applied to constitutional law only. It certainly imports a high degree of authority. No such language is used in the sections (16 or 17) under which other large cities are empowered to frame their own charters.

The whole project for the separation of the city and county, and for the investiture of the city of St. Louis with functions of government formerly appertaining to the county, involved the exercise of sovereign legis-

lative power. Sections 20 and 23 disclose that the
scheme and charter of St. Louis were expected to deal
with some topics properly within the domain of the
general legislative authority of the State—topics affect-
ing the necessary operations of the machinery of the
State government in that locality—as well as to deal
with matters of mere local administration of municipal
affairs.

The "scheme" was expressly intended to provide
for the "enlargement and definition of the boundaries
of the city, the reorganization of the government of
the county, the adjustment of the relations between
the city thus enlarged and the residue of St. Louis
county." That adjustment required provisions to be
made for the collection of the State revenue in the city,
and for the performance of "all other functions in re-
lation to the State" which had previously been per-
formed by the county. Both sections 20 and 23 exhibit
the dual relation that the city was expected to sustain
toward the State, if the scheme and charter were ac-
cepted by the people. The charter of the city (besides
regulating its local affairs) contained many provisions
to define the mode in which the city should perform
many essential governmental duties toward the State,
"as if it were a county" (sec. 23).

The city was practically put in the position of a
county for the purposes of executing the functions of
government in that locality. As those functions were
to be performed by city officers, the scheme and charter
undertook, in the first instance, to prescribe how, and
by whom, those duties should be discharged. But
matters of purely municipal and local concern the Con-
stitution intended to commit to local self-government,
which the peculiar provisions in regard to St. Louis
were designed to authorize.

It may not always be easy to determine what sub-

jects are local and municipal and what are not. That difficulty is not a new one. But it is easy to determine in this case that the boulevard act deals with a subject of strictly municipal concern, for the principle of the decision of the Supreme Court in *State ex rel. Kansas City v. Field* (1889) 99 Mo. 352 (12 S. W. Rep. 802) is decisive of that proposition.

In view of those extraordinary constitutional provisions (which were innovations in our law) and in view of the large powers granted to the freeholders and to the people of St. Louis, it was thought prudent to insert section 25. But the terms of that section certainly do not imply that the General Assembly is to have any greater power over the city and county of St. Louis than it has over other cities and counties of the State. The very words of the section indicate that it is not intended to cut down any of the grants of power in other sections of the ninth article. All parts of the organic law should have due weight. Section 25 seems to us to give no sanction to the holding that the charter of the city of St. Louis is subject to amendment by the General Assembly in those particulars wherein the freeholders charter of Kansas City (for example) is exempt from such amendment.

The people of the State expressed in the Constitution, in most solemn form, a purpose to give the people of St. Louis power to "frame a charter for the government of the city" (sec. 20). It was never intended that the charter should be subject to the same sort of change by special legislation as before the Constitution of 1875. Yet that would be the case if the simple device of legislation applied to population (as in the Act before us) met the approval of the courts.

When we take into view all parts of the Constitution bearing on the question of legislation for municipal organizations, we do not doubt that section

22 in its present form was designed to have the same effect that was ascribed by the Court *in banc* (in the *Kansas City* case, 127 Mo. 642) to that part of section 16 pointing out the mode of amendment of charters framed under section 16. The variation of phraseology by the use of the words "and not otherwise" (in section 16) indicates no difference of intent as to the mode of amendment, when the other parts of that article are considered. The method of direct amendment of the St. Louis charter is ordained by section 22, and that method is exclusive; subject, however, to the repeated qualification that the charter of St. Louis and those of all other cities in the State are subject to the Constitution and laws of the State.

In respect of those topics which involve the relations of the city to the State there can be no doubt that the legislative power of the State may properly be exercised over the city of St. Louis, as has been done in many instances disclosed by decisions in the Missouri Reports. See *State ex rel. v. Tolle* (1880) 71 Mo. 645, approving a law in regard to legal advertisements; *Ewing v. Hoblitzelle* (1884) 85 Mo. 64, sustaining the Act regulating registration, elections and the office of recorder of voters in St. Louis; *State ex rel. v. Miller* (1890) 100 Mo. 439 (13 S. W. Rep. 677) construing a statute for the government of the public schools; *State v. Bennett* (1890) 102 Mo. 356 (14 S. W. Rep. 865) interpreting laws to govern the State board of police in St. Louis; *State ex rel. v. Bell* (1893) 119 Mo. 70 (24 S. W. Rep. 765) sanctioning the law in regard to the excise commissioner in St. Louis; *State ex rel. v. Higgins* (1894) 125 Mo. 364 (28 S. W. Rep. 638) holding valid the Justice of the Peace Act for St. Louis; *Kenefick v. St. Louis* (1895) 127 Mo. 1 (29 S. W. Rep. 838) sustaining the Act for auditing the sheriff's accounts in St. Louis.

The General Assembly has, furthermore, undoubted power to legislate for St. Louis, as for all other cities, in the full exercise of the police power of the State, as well as to enforce direct mandates of the fundamental law by appropriate statutes, and to pass all proper laws that are general throughout the State. *State ex rel. Ziegenhein v. Railroad* (1893) 117 Mo. 1 (22 S. W. Rep. 910) affords an illustration of legislation of the latter sort. In that case a law intended to prescribe rules for assessing railroad property throughout the State was held applicable to St. Louis and operative to repeal charter provisions on that subject.

But the theory (advanced in this case) that the freeholders charter of St. Louis may be amended by an Act such as that before us, while the freeholders charters of cities organized under section 16 may not be so amended, seems at variance with the terms of section 25 which is assigned as the basis of that theory. The charter of St. Louis is subject to the legislative power of the State to the same degree that other cities and counties are. But the degree to which the charters of other cities are subject to amendment by Acts of the General Assembly is limited and defined by section 7 of the same article, already discussed in a previous paragraph of this opinion.

That section imposes positive restrictions on the power to deal at all with city charters, obtained since the Constitution of 1875 took effect. Those limitations are as applicable for the protection of the city of St. Louis against legislation upon its local affairs as to protect any other city against such legislation.

Legislation on local topics, properly comprehended in municipal charters, must be enacted in the manner defined by section 7, by general laws, the nature of which is indicated explicitly, viz: "So that all such

municipal corporations of the same class shall possess the same powers and be subject to the same restrictions." And the number of classes which the General Assembly may create for the organization of cities and towns is positively limited to four.

Those safeguards protect all city charters that have come into being under the Constitution of 1875. Municipal charters of earlier date have been held not to fall within those rules as to classification but to be amendable by general laws, outside the classification prescribed for cities and towns organized since section 7 became part of the organic law. *Rutherford v. Heddens* (1884) 82 Mo. 388; *Rutherford v. Hamilton* (1889) 97 Mo. 543 (11 S. W. Rep. 249). Those decisions should not be extended to reach any case not falling strictly within the facts then in judgment. But nothing decided in those cases sanctions the contention that freeholders charters (authorized to be adopted by the terms of the Constitution itself) may be amended by an Act of the General Assembly such as this before us, conferring municipal powers on all cities now (or hereafter) having 300,000 population, when there are already four general classes of legislative city charters, the first of which is subject to adoption by any city having 100,000 population.

To permit such an amendment of the charter of St. Louis, or any other constitutional charter, would let loose anew many of the evils of special legislation that the Constitution so carefully endeavored to suppress. How earnest was that endeavor is evident from the following passage in the address (already referred to) with which the Constitution was presented to the people.

"The evils of local and special legislation have become enormous. We need but look to our session acts to be satisfied that this species of legislation occupies

the larger portion of the time of our General Assemblies to the neglect and prejudice of public interests. The expense to the State in passing and publishing such laws and the combinations by which private interests have been advanced and dangerous monopolies created are well known. Under the proposed Constitution the General Assembly is prohibited from passing such laws. In all cases where a general law can be made applicable a special law can not be enacted."

We believe in firmly maintaining the barriers which the present organic law has erected against the abuse of legislative power by special and local legislation, and to permit no evasion of the just and wholesome provisions which were intended to abolish that abuse.

We believe in guarding all city charters, accepted under the pledges of the Constitution of 1875, from unlawful invasion by special legislation as to local affairs, and believe in enforcing, as vigorously as any other part of the Constitution, the provisions of section 7 of article IX, limiting the number of classes of cities and towns for which the General Assembly may pass laws conferring municipal powers.

Doubtless, remarks may be found in some of the decisions mentioned in this opinion (and in some other cases cited in the briefs of learned counsel) which are not in entire harmony with all that is above written. But we believe that the actual judgments pronounced in the most, if not in all, of the cases referred to are supported by the principles we have endeavored to elucidate.

4. Finally, it is suggested that a great number of statutes would be invalidated if the views we have indicated are finally accepted as the law. To this it may be answered that many of the statutes that have been cited as coming under the ban of our ruling are plainly

sustainable on various grounds indicated in this opinion. But even if this were not so, there would yet be a more satisfactory answer to give, in the words of another: "No length of usage can enlarge legislative power, and a wise constitutional provision should not be broken down by frequent violations." *People ex rel. v. Allen* (1870) 42 N. Y. 384.

We hold that the boulevard Act is not a valid amendment of the charter of St. Louis.

Up to this point Judges GANTT, MACFARLANE, ROBINSON and BRACE concur in all that has been written.

5. In addition to the reasons above given for affirming the judgment, Judges GANTT, ROBINSON and BRACE consider that the ordinance in question is unconstitutional for the further reason that it is an unwarranted invasion of the right of private ownership of property; and that, even were the ordinance founded upon express authority contained in the local charter (to the same purport as stated in said Boulevard Act of 1891) the ordinance would, nevertheless, be void in so far as it undertook to prohibit the use of defendants' property for a confectionery store on Washington boulevard, because the ordinance is an invasion of a valuable constitutional right of defendants to the enjoyment of their real property, of which right they could not be deprived without just compensation, by any ordinance, whether authorized by the charter or not (*St. Louis v. Hill* (1893) 116 Mo. 527).

The judgment should be affirmed, and it is so ordered, Judges GANTT, MACFARLANE, ROBINSON and BRACE concurring in this opinion as already indicated. Judge SHERWOOD expresses his views in a separate opinion in which Judge BURGESS concurs.

SHERWOOD, J. (*dissenting*).—The defendants, Dorr and Zeller, were prosecuted in the Second District Police Court of the City of St. Louis for the violation of city ordinance No. 16669, approved April 22, 1892.

The alleged violation consisted in carrying on a business avocation, to wit: that of confectioners, in a certain brick building occupied by defendants situated on the south side of Washington boulevard, contrary to the ordinance aforesaid.

In 1891 the General Assembly of Missouri passed the act (Acts 1891, p. 47) entitled "An act relating to boulevards in cities having a population of three hundred thousand inhabitants or more." The first section of the act prescribes as follows:

"Section 1.    All cities in Missouri having a population of three hundred thousand inhabitants or more, or which shall hereafter reach said population, are hereby authorized and empowered to establish by ordinance boulevards and provide for maintaining the same; and may regulate the traffic thereon, and may exclude heavy driving thereon, or any kind of vehicle therefrom, and may exclude the institution and maintenance of any business avocation on the property fronting on said boulevard, . . . . . . . and may convert existing streets into boulevards," etc.

Pursuant to this power and authority, the Municipal Assembly of St. Louis enacted Ordinance 16669, entitled "An Ordinance Relating to Washington Boulevards," approved April 22, 1892.  By this ordinance that portion of Washington Avenue between Grand Avenue and King's Highway was established as a boulevard, to be known as Washington boulevard. The third section of the ordinance is as follows: "Section 3.    The houses fronting or bordering on Washington boulevard, between Grand avenue and

St. Louis v. Dorr.

King's Highway, shall be used as residences only, and no business avocations whatever shall be allowed to be followed in same."

The ordinance makes it a misdemeanor to violate this section.

The case being tried in the Second District Police Court on March 23, 1894, defendants were found not guilty. The city appealed to the Court of Criminal Correction, where, upon a trial being had, it was admitted that the defendants were doing business in said building, number 3924, Washington boulevard, as charged in the pleadings, by carrying on the business of manufàcturing and selling confections. The first floor of the building was used as a business house, and consisted of one main store room about thirty feet wide with a driveway running through the building inside of the outside walls of the building, for the purpose of loading and unloading wagons. Defendants had formerly carried on the same kind of a business at the northeast corner of Vandeventer avenue and Washington boulevard, and about March, 1894, completed this building, moved into it and opened up their business at that point.

At the close of the evidence defendants made an oral motion to be discharged, claiming that the ordinance is unconstitutional and void: "In this, that it attempts to deprive the defendants of the use of their property, and it attempts to appropriate and damage the use of their property for either public or private use; also that it does not appear that there had been any steps taken to condemn this property or the use of this property for special use, or for special restriction, and it is to deprive the defendants of the gains of their own industry, that it is in violation of the first section of the 14th amendment of the federal Consti-

tution, in attempting to deny these defendants the equal protection of the laws.''

The court granted said oral motion, and discharged defendants, and the city brought error.

The questions thus presented by the record are altogether constitutional ones.

It has been suggested that the act approved March 26, 1891, a portion of which has heretofore been quoted, is unconstitutionally invalid because the legislature has no power to amend the charter of St. Louis.    While it is true that the legislature is, by section 53 of article IV of the Constitution in express terms, forbidden to pass any local or special law; regulating the affairs of counties, cities, etc . . . . . . . . or incorporating cities, etc. or changing their charters, yet this prohibition only applies to ''*local or special laws*,'' has no application or reference whatever to *general laws*, because in regard to these, the Constitution is very emphatic.

In section 20, article IX, when providing for a new charter for the city of St. Louis, it is distinctly stated that such charter shall be ''in harmony with, and subject to the Constitution and laws of Missouri.''    This emphasis touching the subjection in manner as aforesaid, of the charter of the city of St. Louis, is repeated in a subsequent section of the same article of the organic law.    Thus in section 22, provision is made for amendments to the charter of the city of St. Louis, and section 23. thereupon says: ''Such charter and amendments shall always be in harmony with and subject to the Constitution and laws of Missouri.''    Nay more, at the close of the article, as if to make ''assurance doubly sure,'' section 25 declares:  ''Notwithstanding the provisions of this article, the General Assembly shall have the same power over the city and county of St. Louis that it has over other cities and counties of this

State." These plain provisions of the Constitution have been enforced by this court on several occasions.

Thus in *Ewing v. Hoblitzelle*, 85 Mo. 64, a law in relation to registration in cities having a population of one hundred thousand inhabitants or more, was held to be not a local or special law but a general law and as such it was competent for the Legislature to pass such a law, and that under the sections in article IX of the Constitution already cited and quoted, such law providing for the appointment by the Governor of a "recorder of voters," would prevail over and abrogate section 15 of article II of the charter of St. Louis by which section the mayor was given power to appoint four judges of election.

In *State ex rel. Atty. Gen. v. Dolan*, 93 Mo. 467, the charter of the City of Kansas provided for the election of a supervisor of registration, but afterwards the act of 1883, created the office of recorder of voters, and this court held that the act of the legislature on that point repealed the charter. *Ewing v. Hoblitzelle, supra*, was cited as confirmatory of that position.

In *State ex rel. v. Miller*, 100 Mo. 439, it was ruled that an act which fixed the number of directors in public school boards by providing that "in all cities of this State now having, or hereafter attaining, a population of over three hundred thousand inhabitants," etc., etc., was a general law although judicial notice would be taken of the fact that only one city in this State at the time had such a population.

So, also, in *State ex rel. Ziegenhein v. Railroad*, 117 Mo. 1, it was ruled that the general law for the extension of taxes levied on railroad property, was in direct conflict with the charter of the city of St. Louis, but that notwithstanding this, the general law should prevail, and this on the ground that the Legislature had

the power to alter or amend the charter of the city of St. Louis, citing *Ewing v. Hoblitzelle, supra.*

So, also, in *State ex rel. Hunt v. Bell*, 119 Mo. 70, the act of 1893 was discussed, which created the office of excise commissioner. Its first section made it applicable to all cities "which now have or may hereafter have a population of two hundred thousand inhabitants." And it was ruled that it was a general law and not a local or special one, and that although by the terms of its charter the city had the power to "license, tax and regulate dramshops" (art. III, sec. 26, par. 5), and although the ordinances of the city passed pursuant to the charter had theretofore required the collector to issue licenses for dramshops both for state and city purposes (art. IV, sec. 1461, Rev. Ord. 1892) and to collect all revenues (sec. 40, chap. III, Rev. Ord. 1892, p. 439), yet that the law thus passed by the legislature repealed the ordinances in conflict therewith, and turned over the issuance of all licenses both for State and city to such excise commissioner.

Another and different class of cases will now be mentioned, and which are easily distinguishable from those heretofore examined, where the acts in question were held to be general laws.

Thus in *State ex rel. Harris v. Herrmann*, 75 Mo. 340, the act of 1881 provided in its caption as well as in its first section applied only to "all cities having a population of 100,000 inhabitants or more;" and section 4 of that act repealed all inconsistent acts and abolished "the office of any notary public in such city holding a commission bearing date prior to the passage of this act, and whose term of office as such notary public has not expired at the time this act becomes a law." And it was there held that inasmuch as we took judicial notice of the population of cities and of the fact that St. Louis was the only city in the State that at the

time of the passage of the act, or which by the usual increase of population could be expected to have that number when the act took effect, and therefore it was to be regarded as intended to apply alone to the city of St. Louis, as much so as if named therein. And further, it was held that inasmuch as section 4 of the act could only apply to an *"existing state of facts,"* and could not apply to matters which might arise in the future, that therefore, the act was a local and special law.

So, too, in *State ex rel. Board v. County Court, etc.,* 89 Mo. 237, the act in terms applied to "all counties in this State in which there is located a city of over fifty thousand inhabitants," was held to be a local and special law for like reasons as last above stated.

But in *Murnane's* case, 123 Mo. 479 on which defendants rely, the law of March 14, 1893, was under discussion which provided that: "In all cities of this State which now have or may hereafter have a population of three hundred thousand inhabitants or over, the whole cost of paving, . . . . shall be charged upon the property adjoining such improvement as a special tax, and levied, collected and paid in the manner and at the time *now provided* by law or charter of said cities for the levy, collection and payment of special tax bills for the street improvements in said cities." And this law was held unconstitutional. This ruling seems to be based on two grounds: *First,* that the act was a local and special law; *second,* that it changed the classification of cities as provided for in section 7, article IX of the Constitution. It can not be gainsaid or denied that the act aforesaid by its very terms, applied to all cities which then possessed or might thereafter become possessed of three hundred thousand inhabitants or over. If this be true, then obviously it was a general law as

it was not confined in its operation to an *"existing state of facts,"* to wit, to cities then possessed of a certain population, but embraced within its comprehensive scope all the cities in this State which thereafter might attain such population. But it was said in effect in the case under comment, that the words, to wit, *"now provided.* by law or the charter of said cities," etc., (two of which words were italicized), caused the real character of the act to appear, and thus turned that which otherwise would have been a general, into a local or special law. The learned judge when writing this opinion seems to have forgotten his brief filed in *Herrmann's* case, 75 Mo. 341, wherein he said, touching the point in hand: "Law is made theoretically, 'not for a day, but for all time.'" If this is the correct theory on which and by which a law or charter is to be construed, and its force and effect determined, then assuredly the provisions in laws or charters in existence when the law of 1893 was passed or went into effect, might well apply to cities which then were governed by a law or charter, but which did not then possess the requisite population, and so could await the necessary increase in that respect. In a word, the law of 1893 provided for and anticipated the wants of the future, and could not be and should not have been balked of its manifest purpose, nor be regarded as a local or special law from the mere fact that such purpose by then existent laws or charters was in the future, as occasion might require, to be effectuated. And just here it is well enough to remark that neither the statute in *Herrmann's* case, *supra*, nor in *State ex rel. v. County Court, supra*, as already seen, bear the least resemblance to the statute in *Murnane's* case, although it is there said that those cases were directly in point. Now, as every lawyer knows, the language referred to and italicized in *Murnane's* case, is by no means *"peculiar"* since it is not at all uncommon

for one statute to refer to another act. Sedgwick Stat. Construc. 229; Sutherland, Stat. Const., section 257, and even in criminal cases an act which creates and defines a new offense, often provides for its punishment "in the manner now provided by law" for the punishment of such and such offenses; and yet in the face of this well known legislative custom, attested as it is by every statute·book in the land, *Murnane's* case when reduced to its last analysis gives utterance to the startlingly anomalous doctrine that a statute general in form, in every particular, will at once become a local or special law should it happen to refer for its future execution to *present methods of procedure.* Just as if laws and charters like hot cakes have to be served or used as soon as done.

And in this connection it is proper to state that the adverb *"now"* does not necessarily mean *at the present time.* This view finds illustration in *Clark v. Lord,* 20 Kan. 390, where the statute provided that: "All instruments of writing now copied," etc. This act was approved February 20, 1868, and notwithstanding this it was held that the word "NOW" referred to the time when the act regulating conveyances of real estate took effect in the *subsequent* October.

In another instance, *Waugh v. Middleton,* 8 Ex. 352, the language of the Bankrupt Act of 1849, was "every deed or memorandum of arrangement now or hereafter entered into," did not apply to such instruments as were entered into and *completed* before the passing of the statute, and this was done upon the ground that in order to prevent injustice and to carry out the intent of the act, that the court felt justifiable in resorting to any means to get rid of the apparent effect of the word *"now,"* and accordingly held it not to have been used in the sense of *"heretofore"* but to apply to transactions *not yet completed* when the act

took effect. This desire of carrying out the intention of the legislature by enlarging or restricting the meaning of certain words, is abundantly illustrated in many text-writers and reports; you can scarcely go amiss of them. Thus in *Kugler's Appeal*, 55 Pa. St. 123, where an act allowed an appeal by words of general reference, the same as another act, the only one which allowed appeals, and thereupon it was said that the words in the case provided for by the earlier act were intended "as a rule of *for future conduct*, a rule always to be found, when it is needed, by reference to the law existing at the time when the rule is invoked."

A similar view was expressed in another case where a *statute* prohibited contests of speed of animals "excepting such as are by special laws for that purpose expressly allowed," and it was held that this expression was not limited to the adoption of the statute then existing, but that such exception would operate to include such special laws as might *subsequently* be passed. *Harris v. White*, 81 N. Y. 532.

So, also, in *Jones v. Dexter*, 8 Fla. 276, an act adopted the provisions of the law regulating descents as furnishing the rule for the distribution of personal estate, was held intended to refer to *any law* of descents *which might be in force at the time the right to distribution became vested*. See, also, Endlich Interp. Stats., sec. 493. All laws are presumed to be intended to operate prospectively and not otherwise, unless language to the contrary be expressed or the implication of such intention from the language employed be indubitably clear. This is the inflexible and universal rule. The authorities already cited illustrate the strong tendencies of the courts in this direction, when construing statutes of doubtful import; and besides that, the act of 1893 as above quoted, gives very strong tokens that that act shall apply alone to future events not only by the beginning of the first

section, but also by the words: *"shall be charged* upon the property,'' etc.   These words clearly indicate *future operations*, and if the authorities cited are to be followed, should not be dwarfed of their proper significance nor shorn of their legitimate meaning, by the use of words which only point out the *method of procedure* when such future operations begin.   Surely the meaning of such words of future aspect should not be frustrated and overthrown by the single adverb *"now*,'' meaning the present time, which (as Pollock, C. B., remarks in *Waugh v. Middleton, supra*) *"if it does mean this, certainly means it by the smallest amount of expression that can be used to convey it.''*

Furthermore, to resort to such a construction of a statute, which allows a single isolated word to *defeat and render null an entire legislative enactment*, is at war with that wholesome canon of construction which gathers the intention of a statute from the *whole* of it and allows such intention to prevail over the strict sense of the *terms* used, in order to avoid injustice and to prevent absurdity, contradiction and unreason, as it will always be presumed that the legislature intended exceptions to its language which would avoid results of this character.   Bishop Writ. Law, sec. 93; Endlich Interp. of Stats., secs. 258, 35; Sutherland Stat. Const., secs. 260, 218, 239–246, 325.

"If possible, a statute must be so construed as to make it effect the purposes for which it was intended.'' Endlich, sec. 29.   Vague conjecture, slight implication, or the abstract and hypocritical niceties of a finical taste are not to be employed in the constitutional construction of a statute.   *Prima facie* a law is constitutional; *prima facie* it conforms in all essential particulars to the requirements of the organic law, and the well known rule of construction applies in cases of this sort, that a statute is not to be presumed repugnant to

the Constitution until such repugnancy is made to appear beyond a reasonable doubt.   Touching this point Judge Cooley very pertinently observes:

"The duty of the court to uphold a statute when the conflict between it and the Constitution is not clear, and the implication which must always exist that no violation has been intended by the Legislature, may require it in some cases, where the meaning of the Constitution is not in doubt, to lean in favor of such a construction of the statute as might not at first view seem most obvious and natural.   For as a conflict between the statute and the Constitution is not to be implied, it would seem to follow, where the meaning of the Constitution is clear, that the court, *if possible, must give the statute such a construction as will enable it to have effect.*   This is only saying, in another form of words, that the court must construe the statute in accordance with the legislative intent; since it is always to be presumed the legislature designed the statute to take effect, and not to be a nullity."   Cooley Const. Lim. [6 Ed.] 218. And when speaking of presumptions attendant on the validity of a legislative enactment, it has been very forcibly said:  "The presumption against *absurdity* in the provision of a legislative enactment is probably a more powerful guide to its construction than even the presumptions against unreason, inconvenience or injustice.   The legislature may be supposed to intend all of these; but it can scarcely be supposed to intend its *own stultification.*   Accordingly, it has been said that, when to follow the words of an enactment would lead to an absurdity as its consequences, that constitutes sufficient authority to the interpreter to depart from them."   Endlich, sec. 264.   Moreover, it is abundantly established as a rule of construction, that:

"Notwithstanding the general rule that full effect must be given to every word, if no sensible meaning

can be given to a word or phrase, or if it would defeat the real object of the enactment, it may, or rather it should, be *eliminated.*" Endlich, secs. 301, 302; Sutherland Stat. Const., sec. 260.

This course of construction has been pursued in this State ever since *State v. Beasley,* 5 Mo. 91; *State v. Acuff,* 6 Mo. 54; *State to use v. Heman,* 70 Mo. 441; *Bingham v. Birmingham,* 103 Mo. 345, in which last case *eight words* were stricken out of a section of a statute in order to promote the plain intent of the legislature to make all sections of the law harmonize; in short, to *"make sense"* out of the act.

It is scarcely necessary to say that none of the well-grounded canons of construction above mentioned, sanctioned as they are by the wisdom and experience of ages, and none of the authorities in which those rules are embodied, are noted or even alluded to in *Murnane's* case; on the contrary, the meaning of the whole act of 1893, with all its extended and varied phraseology, is made to turn (like the toss of a copper or one throw of the die) upon the import of a single monosyllablic word of *three* letters. If this is not *"sticking in the bark,"* then the general utility of the maxim *"qui haeret in litera haeret in cortice"* is not altogether self-evident.

Guided by the authorities aforesaid, and all legitimate deductions therefrom, we are constrained to hold that the act of 1893 was not a local or special law, but a general law in the fullest and most complete sense of that term. But making for the sake of argument, the enormous concession that the act of 1893, just discussed, is a local or special law, still such concession can not affect the act of 1891, as that act does not "bear its death wound on its face," to wit, that fatal adverb *"now,"* and consequently there is no "slight blemish in the veneering" of *that* act.

II.   It is said, however, that the legislature has no power to amend the charter of the city of St. Louis, even by a general law.   It is to be especially noted that no mention nor citation of, nor quotation from sections 20, 23 and 25 of article IX of the Constitution heretofore set forth is made in *Murnane's* case, although section 7 of the same article is quoted in *full*, and also the prohibitions of section 53 of article IV of the Constitution with regard to passing any local or special law:   "Regulating the affairs of counties, cities, etc. . . . . . . . or incorporating cities, etc., or changing their charters," are carefully copied.   Why the other sections of the article directly relating to the city of St. Louis, though that city is mentioned *by name three times* in section 20, *once* in section 23 and again in section 25, were omitted is beyond ken and comprehension.   It would seem that judicial fairness should have required that sections 20, 23 and 25 aforesaid should have been cited and commented on.   But it matters little, in one sense, what the cause or occasion of such omissions, because a general law and a special or local law are *correlative terms*, and each indicates the existence of each other.   An approved text-writer, already cited, on this topic says:   "The requirement of general laws . . . . . . . is an implied prohibition of special or local laws; so the express prohibition of local or special laws is an implied requirement that legislation shall be general.   Individual cases of the enumerated class can not be provided for.   These are converse forms of similar constitutional regulation."   Sutherland Stat. Const., sec. 126.

When the Constitution by section 53 of article IV forbade the legislature to pass any local or special law: "Regulating the affairs of counties, cities, etc. . . . . . . or incorporating cities, etc., or changing their charters," it thereby by inevitable implication *granted permission*

to the legislature to legislate on those subjects *by general laws*, and this upon the principal of *"expressio unius exclusio alterius."* But not content with such plain implication, the framers of the Constitution superadded thereto the explicit provisions in sections 20, 23, and 25, which included in section 23 even the *amendments* to the charter of the city of St. Louis, and section 25 winds up with the sweeping and conclusive declaration: "Notwithstanding the provisions of this article, the General Assembly shall have the same power over the city and county of St. Louis it has over other cities and counties of this State." Does any one doubt that the General Assembly can, by general laws, control the local affairs of the *counties* of this State? Certainly not. Then by the same token it possesses the same power over the *cities* of this State. The Constitution furnishes no warrant for the assertion that the power of the legislature is restricted to the *"local concerns"* of such cities, at least of the city of St. Louis, which is the subject of the present investigation.

The Constitution has made no exceptions to its general grant of power to the legislature, and the courts without judicial usurpation can make none. But it is urged that if you admit the power of the legislature by general law to amend the charter of the city of St. Louis, you thereby change the classification of the cities of this State as provided for in section 7 of article IX of the Constitution. But it is enough to say of such section *that it has nothing whatever to do with the city of St. Louis*, since that city is by the Constitution singled out and segregated from all other cities in this State, by express mention by name, as well as by peculiar and special provisions, shared by no other city. That section has no more to do with the city of St. Louis, than has section 16 of the same article, which

confessedly has no application to that city, and no more has section 17.   But granting that the city of St. Louis belongs to the *"first class,"* it is insuperably difficult to see how any change could occur in the classification of the cities of that class, if the following remark made, in *Murnane's* case, *loc. cit.* 489, is to stand:

"If the charter of St. Louis is repealed by the legislation of 1893, so also is repealed the like provision of the charter of cities of the first class.   It is this obvious result which renders the act of 1893, in my opinion, void and of no effect."

Because if the act of 1893 *repealed the charter of all* cities of *that* class, then indubitably it made their charters all *alike* in so far as it operated, *and so worked no change in their classification.*   This result is too plain for argument.   And it is conceded that the State may amend the charters of cities in *"State affairs"* and certainly this is a *change,* and therefore to be followed according to the theory announced, by all the horrible consequences incident to a *change in classification.*

III.   Having thus gotten rid of the *debris,* caused by the discussion of *Murnane's* case, we are at liberty to devote attention to the case at bar; it lies within a very small compass.

In *St. Louis v. Hill,* 116 Mo. 527, where another section of the act of 1891, and an ordinance based thereon, underwent discussion, we there held that the city could not deprive the owner of the *use* of a portion of his property, by compelling him to set his dwelling house forty feet back from the "building line" of Forest Park boulevard on the ground that the ordinance which authorized such building line and compels its observance, was null and void because, *first,* it deprives the owner of his property without due process of law, thus violating section 30 of article II of the Constitution; *second,* because such ordinance took the property of

the owner without affording him compensation therefor in violation of section 21 of the same article.

In other words, we held in that case, that the *use* of property *was property itself*, within the meaning of the Constitution. We still adhere to that view.

We regard that case as decisive of this one, the only difference between them being that in the former the ordinance only deprived the owner of a *portion* of his lot, while in the latter he is deprived of *all* of his property unless he will conform its use to the unconstitutional demands of the city authorities.

In the exercise of legitimate police regulations a municipality may do many things delegated to it as powers to be exercised for the public good. "Of this nature is the authority to suppress nuisances, preserve health, prevent fires, to regulate the use and storing of dangerous articles, to establish and control markets, and the like. . . . . . . . This power to restrain a private injurious right of property, is essentially different from the right of eminent domain. It is not a taking of private property for public use, but a salutary restraint on a noxious use by the owner contrary to the maxim, *sic utere tuo ut alienum non laedas.*" 1 Dillon, Mun. Corp. [4 Ed.], sec. 141.

Doubtless a municipality when properly authorized may forbid the *noxious* use of property by the owner, or of property that has a tendency or likelihood of becoming noxious. *St. Louis v. Russell*, 116 Mo. 254, but beyond this a city can not go without infringing the constitutional rights of the owner. And though a city has power conferred upon it by the legislature to pass ordinances of a specified and defined character, and though such ordinances thus passed by virtue of such authority can not be impeached as invalid because unreasonable, yet such ordinance can not stand if in conflict with the Constitution. 1 Dillon, Mun.

Corp. [4 Ed.], sec. 328. Now in this case the proposed use is entirely *innocuous*, and with no tendency to become otherwise. Therefore, judgment affirmed. BURGESS, J., concurs.

The foregoing opinion which was adopted in Division 2 has been rejected *in banc* and for the reasons given in my opinion Judge BURGESS and myself dissent.