STATE OF IOWA, *ex. rel.* WIN S. WHITE, Appellant, and JOHN E. ROBSON, Intervenor, Appellant, v. W. H. BARKER, G. B. HEALY, J. F. ALLISON and E. B. SPAULDING, Appellees.

**Constitutional Law:** *Power of district judges to name trustees of city water works.* Code, section 747, as amended by Acts
3 Twenty-seventh General Assembly, chapter 23, and Acts Twenty-eighth General Assembly, chapter 25, authorizing the district court to appoint the trustees of water works in cities of the first class, is invalid as taking from the city the right of local self-government.

*Same.* The statute is unconstitutional and void, as divesting the
4 city of the management and control of its property.

*Same.* The statute, in authorizing the appointment of the trustees by the district court, which is a constitutional court, and subject to Constitution, article 3, section 1, providing that no person charged with the exercise of powers belonging to one
5 of the departments of the government shall exercise any functions appertaining to either of the others, except as provided in the constitution, is unconstitutional and void, as authorizing the performance by the court of a non-judicial function, not connected with the exercise of the judicial powers conferred on the court.

**Quo Warranto Action:** PARTY ENTITLED TO MAINTAIN: *Title to be officer in water works.* A citizen and a taxpayer of a city of the first class, who contributes to the support of the water
1 works, has sufficient interest in the right of office of persons appointed as trustees of the water works, to prosecute an action of *quo warranto*, under Code, section 4316, which provides
2 that, if the county attorney refuses to prosecute such action, any citizen in the state having an interest in the question may prosecute by permission of the court.

SUPERINTENDENT OF CITY WATER WORKS SYSTEM. The superintendent of the water system of the city has sufficient interest, under Code, section 4316, in the right of such appointees to the office
2 of trustees of the waterworks to maintain an action of *quo warranto* to determine such right, on the refusal of the county attorney to prosecute such action.

*Appeal from Woodbury District Court.*—HON. GEO. W.
WAKEFIELD, Judge.

THURSDAY, FEBRUARY 13, 1902.

QUO WARRANTO proceedings to test the validity of the appointment of defendants as a board of waterworks trustees, and of defendant Spaulding as superintendent of the waterworks system of the city of Sioux City, and to test the constitutionality of certain acts of the legislature authorizing the appointment of such officials by the district court of the county. The trial court dismissed the petitions, and the plaintiff and the intervener appeal.—*Reversed.*

*F. E. Gill, Quick & Carter,* and *Swan, Lawrence & Swan* for appellants.

*R. J. Chase* for appellees.

DEEMER, J.—The 26th, 27th, and 28th general assemblies passed acts creating a board of waterworks trustees for cities of the first class, and authorizing the appointment of such board by the district court of the county in which such cities are located. Vide sections 742 and 750 inclusive, of the Code. Acts 27th General Assembly, chapter 23, and Acts 28th General Assembly, chapter 25. Sioux City is a city of the first class, and has owned and operated its waterworks system since the year 1885. In the year 1898 the then mayor made application to the district court of Woodbury county for the appointment of a board of trustees for the system, under the provisions of the acts of the legislature hitherto mentioned. Pursuant to this application, the four judges of the Fourth judicial district, in which Woodbury county is situated, met in Sioux City, and appointed the defendants as trustees of the system. Defendant Spaulding refused to serve, and defendant Allison

VOL. 116 IA—7

was appointed in his place. Three of the judges who participated in the conference and assisted in the selection of the trustees were and are non-rsidents of Woodbury county, but the other was and is a resident of Sioux City. The persons so appointed filed bond in a sum fixed by the district court, and at once assumed control of the waterworks system, entered upon the discharge of their duties, and have since been in the exclusive possession, control, and management of the system. The relator is a resident citizen and taxpayer of the city of Sioux City, and a contributor to the support of the waterworks system. Intervener was, on the third Monday of March in the year 1899, appointed by the city council of the city of Sioux City to the office of superintendent of the waterworks system. He duly qualified as ·such, and he and the plaintiff, before the commencement of this proceeding, each made demand on the ·county attorney to bring action to test the validity of the defendants' appointment, and the constitutionality of the acts under which the appointments were made. The city council also passed a resolution authorizing the commencement of the action. As the county attorney refused to bring the suit, the relator commenced it, and Robson, the superintendent appointed by the council, intervened, and asked the same relief as relator. Such, in brief, is a statement of the more important facts in the case, and the questions of law involved are so well.stated by appellees' counsel that we use them as a basis for this opinion. They are as follows: "First. Has the legislature of Iowa the constitutional power to take away from the city council the control and management of the waterworks, and place such control and management in a board of trustees? Second. Assuming that the legislature has such power, are the acts of the legislature in question unconstitutional by reason of the manner of the execution of the power? In other words, do the provisons placing the power of appointment of the members of the board of trustees with the district court of Woodbury county infringe any provision of the constitution?

Third. Has Win S. White such an interest in the questions involved as will enable the court to render judgment in this case upon the merits thereof ?"

As third proposition involves a question of practice, it is perhaps well to settle that before proceeding with the merits of the case. Section 4316 of the Code, relating to *quo warranto* proceedings, reads as follows: "Sec. 4316. By Private Persons. . If the county attorney, on demand, neglects or refuses to commence the same, any citizen of the state having an *interest* in the question may apply to the court in which the action is to be commenced, or to the judge thereof, for leave to do so, and, upon obtaining such leave may bring and prosecute the action to final judgment." It is admitted that the county attorney refused to bring the action, and the only question for decision on this branch of the case is, has the relator such an interest in the question as that he may apply to the court for leave to do so? We think he has such interest. A private citizen and taxpayer is undoubtedly interested in the duties required of the several public officials who are authorized to levy taxes. This is not a contest over an office, as were many of the cases cited in appellees' brief, but a matter of public interest in which relator has a special interest by reason of being a contributor to the funds. *State v. City of Des Moines,* 96 Iowa, 521; *Cochran v. McCleary,* 22 Iowa, 75; *State v. School Dist.,* 29 Iowa, 264; *State v. Casualty Co.,* 77 Iowa, 648; *Ford v. Town of North Des Moines,* 80 Iowa, 637; *State v. Bailey,* 7 Iowa, 390; *Brockman v. City of Creston,* 79 Iowa, 587. *State v. City of Des Moines, supra,* is conclusive of the point. As we have said, if this were a contest over the right to hold office, relator should have shown that he was elected or appointed to that office; or if it had been an action to dissolve the corporation, perhaps he could not have maintained the suit. But it is neither, and under our statute there seems to be no doubt of his right to sue. In any event, the intervener was entitled to

maintain the action, because he had been appointed to the office of superintendent of the system pursuant to an ordinance adopted by the city. See, as further sustaining our conclusions on this point: *Darrow v. People,* 8 Colo. 417, (8 Pac. Rep. 661); *Churchill v. Walker,* 68 Ga. 681; *State v. Martin,* 46 Conn. 479; *Taggert v. James,* 73 Mich. 234, (41 N. W. Rep. 262); *Com. v. Meeser,* 44 Pa. St. 341; *People v. Londoner,* 13 Colo. Sup. 303, (22 Pac. Rep. 764).

The other points presented involve constitutional questions that, to some extent at least, are new to the courts of this state. Preliminary to a discussion of the propositions involved, it is well to determine the powers, duties and functions of a municipal corporation. Judge Dillon, in his masterly work on such corporations, gives an interesting and exhaustive history of their origin, growth, and development. Within the limits of a judicial opinion it is manifestly impossible to do more than state in the most general way some well-established historical facts regarding the development of municipalities. Man has ever been gregarious by nature, and, emerging from a state of barbarism, he naturally sought the society and fellowship of his kind. Rude gatherings and somewhat formless centers of population were the result, and from these were evolved better forms of organization and higher degrees of compactness, until even in remote antiquity great cities were established, which could only have been maintained by a system of municipal government, crude and incompetent at first, but certainly by no means contemptible. The storied splendors of the prehistoric cities of the old and new world are not wholly mythical. Indeed, the general trend has been from the unorganized to the organized; from the protoplasmic to the more complex and higher and more efficient forms of life. In the early Hellenic civilization the city was the state, governed in general by the whole body of free citizens, who met and discussed all questions of policy. The history of Rome is simply an account of the greatest municipal cor-

poration the world has ever seen. The Roman republic took its origin from the city of the Tiber, and was but a development and extension of that city; and the empire erected on its foundations was remarkable for the power, influence, and wealth of the municipalities. During the dark ages the cities preserved what was left of knowledge, culture, and art. With the dawn of the Renaissance came Christianity and the feudal system, and the castle of the baron became the unit of government. The germ of the municipal corporation in England is to be traced to the "farmer commonwealths" of the early Teutons, and each "wick," "ham," "stead," or "tun" took its name from the kinsmen who dwelt together therein. "Each, judged by witness of the kinsfolk, made laws in the assembly of its freemen, chose leaders for its governance, and the men who were to follow headman or ealderman to hundred, court, or war." Green's Short History of English People, p. 15, section 2; Id. p. 93, section 6; Angell & Ames Corp. section 21. As to the growth of English guilds and boroughs, see Dillon, Municipal Corporations c. 1; 3 Hallam Middle Ages, chapter 8, and Green's History, chapter 4. Our own towns were established in accordance with the English principles of liberty, but they generally possess greater powers of local self-government than their English prototypes; and, as said by Cooley in his work on Constitutional Limitations (page 223): "In contradistinction to those governments where powers are concentrated in one man, or in one or more bodies of men, whose supervision and active control extends to all the objects of government within the territorial limits of the state, the American system is one of complete decentralization, the primary and vital idea of which is that local affairs shall be managed by local authorities, and general affairs only by the central authortities." See, also, De Toqueville on Democracy in America, tome 1, 64, 96, wherein it is said that municipal corporations form the principle of American liberty existing to this day. The history of New

England towns is quite generally understood, and we need only cite the following cases for an epitome of their origin and powers: *Warren v. Mayor, etc.,* 2 Gray, 84; *Town of Bloomfield v. Charter Oak Bank,* 121 U. S. 121, (7·Sup. Ct. Rep. 865, 30 L. Ed 923); *Hill v. City of Boston,* 122 Mass. 344, (23 Am. Rep. 332); Dillon, Municipal Corporations sections 28-30; and Local Constitutional History of the United States by George E. Howard (volume 1, chapter 2). The result of all this discussion is a definition of the term as follows: "We may, therefore, define a municipal corporation in its historical and proper sense to be the incorporation by the authority of the government of the inhabitants of a particular place or district, and authorizing them in their corporate capacity to exercise subordinate specified powers of legislation and regulation with respect to their local and internal concerns. This power of local self-government is the distinctive purpose and the distinguishing feature of a municipal corporation proper." Dillon, Municipal Corporation, section 20. The only fault with this definition, if there be any, is that it does not embrace the inhabitants as well as the territory, for the term embraces both the territory and its inhabitants. *Kelly v. City of Pittsburgh,* 104 U. S. 78, (26 L. Ed. 659); *City of Galesburg v. Hawkinson,* 75 Ill. 156. Under our form of government the legislature creates municipal corporations, defines and limits their powers, enlarges or diminishes them at will, points out the agencies which are to execute them, and possesses such general supervision over them as it shall deem proper and needful for the public welfare. As to all matters of public concern, such as relate to the performance by the city of functions as an agent of the state, the legislature is unlimited in its power. *State v. Mason,* 153 Mo. 23, (54 S. W. Rep. 524); *People v. Mahaney,* 13 Mich. 481. Neither the character of a municipal corporation nor any legislative act regulating the use of property held by it for governmental purposes is a contract

within the meaning of the constitutional inhibition of laws impairing the obligation of contracts and where there is no constitutional restriction, either express or implied, upon the action of the legislature, it has absolute control to create, change, modify, or destroy such corporations at pleasure. *City of Covington v. Kentucky,* 173 U. S. 231, (19 Sup. Ct. Rep. 383, 43 L. Ed. 679; *Meriwether v. Garrett,* 102 U. S. 472, (26 L. Ed. 197); *City of St. Louis v. Shields,* 52 Mo. 351; *City of Mt. Pleasant v. Beckwith,* 100 U. S. 514, (25 L. Ed. 699). But the legislative control of municipal corporations is not without limitations. This immunity from unlimited legislative control has been expressly recognized by the supreme court of the United States in *City of New Orleans v. New Orleans Waterworks Co.,* 142 U. S. 79, (12 Sup. Ct. Rep. 142, 35 L. Ed. 943), where it is said "that the municipality, being a mere agent of the state, stands in its governmental or public character in no contract relation with its sovereign, at whose pleasure its charter may be amended, changed, or revoked without the impairment of any constitutional obligation, while with respect to its private or propietary rights and interests it may be entitled to the constitutional protection." The dual capacity of such a corporation has long been recognized; in other words, it is in part a public agency of the state, and in part possessed of local franchises and rights, which pertain to it as a legal entity for its corporate advantage. The right of a municipal corporation to hold and manage property, to sue and to be sued, and to act generally as a private corporation in supplying local needs and conveniences, has been distinctly recognized by a long line of well-considered cases. *Western Sav. Fund Soc. v. City of Philadelphia,* 31 Pa. St. 175, (72 Am. Dec. 730); *People v. Common Council of Detroit,* 28 Mich. 229 (15 Am. Rep. 202); *People v. Hurlbut,* 24 Mich. 44, (9 Am. Rep. 103); *People v. Draper,* 15 N. Y. 561, as explained in *People v. Albertson,* 55

N. Y. 50; Glover, Municipal Corporation pp. 1, 2, 4, 18, 19; Dillon, Municipal Corporation (4th Ed.) 3a, 8a, 8d, 28; *City of St. Louis v. Dorr,* 145 Mo. 479, (41 S. W. Rep. 1094, 46 S. W. Rep. 976, 42 L. R. A. 686) ; *State v. Denny,* 118 Ind. 382 (21 N. E. Rep. 252, 4 L. R. A. 79) ; *State v. Moores,* 55 Neb. 480, (76 N. W. Rep. 175, 41 L. R. A. 624) ; *Proprietors of Mt. Hope Cemetery v. City of Boston,* 158 Mass. 509, (33 N. E. Rep. 695, 35 Am. St. Rep. 515) ; Elliott, Municipal Corporation, section 28; *Illinois Trust & Savings Bank v. City of Arkansas City,* 22 C. C. A. 171, (76 Fed. Rep. 271, 34 L. R. A. 518); *People v. Mayor, etc., of City of Chicago,* 51 Ill. 17.; *Davock v. Moore,* 105 Mich. 120, (63 N. W. Rep. 424, 28 L. R. A. 783) ; *State v. Hunter,* 38 Kan. 578, (17 Pac. Rep. 177) ; *State v. Kolsem,* 130 Ind. 434, (29 N. E. Rep. 595, 14 L. R. A. 566) ; *Wagner v. City of Rock Island,* 146 Ill. 139, (34 N. E. Rep. 545, 21 L. R. A. 519). Some of the cases cited proceed on the theory that the legislature has no power, after creating a municipal corporation, to take away from it the right of local self-government. The argument is that the intention to preserve and perpetuate the ancient right of local self-government, which the law recognizes as of common-law origin, and having no less than common-law franchises, is apparent throughout the scope of most American constitutions. Some of the judges even go so far as to say "that, local self-government having always been a part of the English and American systems, we shall look for its recognition in any such instrument [constitution] ; and, if not expressly recognized, it is still to be understood that all these instruments are framed with its present existence and anticipated continuance in view;" "that back of all constitutions are certain usages and maxims that have sprung from the habits of life, mode of thought, methods of trying facts, and mutual responsibility in neighborhood interests; precepts that have come from revolutions which overturned tyrannies; sentiments of manly independence and self-con-

trol, which impelled our ancestors to summon the local community to redress local evils, instead of relying upon king or legislature at a distance to do so; that form the living spirit of the lifeless skeleton known as the constitution; that gives it force and attraction, and that distinguishes it from the numberless so-called constitutions of Europe; and that this so-called living spirit should supply the interpretation of the words of the written charter." We are not to be understood as fully approving all that is said in some of the cases regarding the right of local self-government, nor do we mean to hold that there is an unwritten constitution complete and comprehensive in itself. All that we intend to announce is that written constitutions should be construed with reference to and in the light of well-recognized and fundamental principles lying back of all constitutions, and constituting the very warp and woof of these fabrics. A law may be within the inhibition of the constitution as well by implication as by expression. *Page v. Allen,* 58 Pa. St. 338, (98 Am. Dec. 272); *People v. Gillette,* 159 N. Y. 125, (53 N. E. Rep. 755); *Bailey v. Railroad Co.,* 4 Har. (Del.) 389, (44 Am. Dec. 593). But we will not elaborate this thought. Suffice it to say that we have already recognized the principles announced in *State v. City of Des Moines,* 103 Iowa, 76, wherein it was held, after referring with approval to many of the cases we have cited, that the legislature could not delegate the power of municipal taxation to a board not elected by and immediately responsible to the people to be affected thereby. This court, speaking through Kinne, J., said there was an implied limitation on the power of the legislature to delegate the power of taxation. Right of local self-government was also recognized in *State v. Forkner,* 94 Iowa, 1. Section 25 of article 1 of the constitution provides that "this enumeration of rights shall not be construed to impair or deny others retained by the people." Some of the cases we have cited hold to the doctrine that the rights of the inhabitants of a municipal

corporation to local self-government is one of the rights re-
tained by the people. But we need not and do not go to this
extent, except in so far as private and proprietary rights and
interests are concerned, as will hereinafter appear.   Mu-
nicipal corporations are recognized by the constitution, and
certain limitations placed on the power of the legislature
with reference thereto.   Thus it is provided that "no cor-
poration shall be created by special laws, but the general as-
sembly shall provide by general law for the organization of
all corporations hereafter to be created." Section 1, article
8.   Section 12 of the same article, authorizing the repeal or
amendment of all laws relating to corporations, has no ap-
plication to   municipal   corporations.   *Ex parte Pritz,* 9
Iowa, 30.   Section 30 of article 3 prohibits the passage of
local or special laws for the incorporation of cities and
towns.   It thus appears that municipal corporations are rec-
ognized by our fundamental law, and that no special or lo-
cal law relating thereto may be passed.   We are also of
opinion that there are other well-defined limits on the power
of the legislature in dealing with such bodies.   But we need
not further elaborate on these points.   Any other conclusion
than the one we have reached would necessitate the over-
ruling of the case in 103 Iowa, 76, and that we are n^^ pre-
pared to do.

II.   There are other considerations, however, that lead
to the same conclusion.   We have already called attention
to the dual nature of municipal corporations, and have dis-
covered that with respect to private and proprietary rights
and interests they are entitled to constitutional protection.
It is quite clear that the establishment and control of water-
works for the benefit of the inhabitants of the city is a mat-
ter that pertains to the municipality, as distinguished from
the state at large.   Dillon, Municipal Corporation, section
58; *Proprietors of Mt. Hope Cemetery v. City of Boston,*
*supra; Western Sav. Fund Soc. v. City of Philadelphia,*
*supra; City of Kansas City v. Marsh Oil Co.,* 140 Mo. 472,

(41 S. W. Rep. 943): In *President, etc. of City of Pater-son v. Society for Establishing Useful Manufactures,* 24 N. J. Law, 385, it is held, in substance, that a municipal corporation exercising powers conferred not for public purposes, but for its private benefit and emolument, will be regarded *quod haec* as a private corporation. See, also *Town of Montpelier v. Town of East Montpelier,* 29 Vt. 12, (67 Am. Dec. 748); *Atkins v. Town of Randolph,* 31 Vt. 226; *Dartmouth College v. Woodward,* 4 Wheat. 694, (4 L. Ed. 629); *City of Detroit v. Detroit & H. P. R. Co.,* 43 Mich. 140, (5 N. W. Rep. 275); *Helena Consol. Water Power Co. v. Steele,* 20 Mont. 1, (49 Pac. Rep. 382, 37 L. R. A. 412); *City of Newport v. Horton,* 22 R. I. 196, (47 Atl. Rep. 312, 50 L. R. A. 330); *City of Louisville v. President, etc., of University,* 15 B. Mon. 642; *Town of Milwaukee v. City of Milwaukee,* 12 Wis. 94. Having, then, a proprietary and private interest in its waterworks system, granted to it by the legislature, or incident to its power to acquire and hold property, the question recurs, may the management and control of this property be taken out of its hands by the legislature, and invested in trustees appointed by the district court; especially where, as in this case, the trustees so appointed are in no respect responsible to the appointing power, and are not required to make reports thereto? We think not. If the city were a mere private corporation, it would need no argument to show that the legislature could not take the management of its property out of the hands of its officers and directors, and place it in the custody and control of officials, even if they be stockholders, selected by persons who had no interest in the corporate entity, and who were in no manner responsible to those interested in the welfare of the organization. Such divestiture of property, or, what is the same thing, of its management and control, would be unconstitutional and void. The same rules have been applied to property held by a municipal corporation in its private and proprietary ca-

pacity. See cases heretofore cited, and Dillon, Muncipal Corporation (4th Ed.) sections 68, 68a, 69. *Orr v. Bracken Co.*, 81 Ky. 593; *Small v. Inhabitants of Danville*, 51 Me. 359; *Western College v. City of Cleveland*, 12 Ohio St. 375; *Oliver v. City of Worcester*, 102 Mass. 489, (3 Am. Rep. 485); *De Voss v. City of Richmond*, 18 Grat. 338, (98 Am. Dec. 647); *Niles Waterworks v. City of Niles*, 59 Mich. 311, (26 N. W. Rep. 525); *Commissioners v. Duckett*, 20 Md. 468. This view appears to us to be based on the soundest of reasons, and to be supported by the weight of authority. It is alone sufficient to dispose of the case, but there is another objection, even stronger than the ones we have been considering.

III. The division of the powers of government into three different departments—legislative, executive, and judicial—lies at the very foundation of our constitutional system. The fathers had in mind "Montesquie's Dissertation on the Spirit of the Laws," in which he said: "There is no liberty if the power of judging be not separated from the legislative an executive powers. When the legislative and executive powers are united in one body or person, there can be no liberty, because apprehensions may arise lest the same monarch or senate should enact tyrannical laws to execute them in a tyrannical manner." He further said: "Were the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control, for the judge would then be the legislator. Were it joined to the executive, the judge might behave with all the violence of an oppressor." Recognizing the dangers to be feared from concentration of power, our constitution builders not only created the three departments, but especially provided in section 1, article 3, that "no person charged with the exercise of powers properly belonging to one of these departments shall exercise any function appertaining to either of the others, except in cases hereinafter expressly directed and permitted." The act in question au-

thorizes the district court to appoint trustees for the water-
works system, and, strangely enough, requires the concur-
rence of more than one judge, failing to recognize that the
district court can only be presided over by one judge.    The
appointment is to be made for a going concern, and without
regard to dissensions or contests regarding the control or
management of the system; and the inquiry naturally arises
is this a judicial function?    If it is, then the judiciary may
be authorized, empowered, and required to select any or all
municipal officers.    In the further discussion of the ques-
tion it must be borne in mind that the district court is cre-
ated by the constitution, and what is said has reference to
a constitutional court.    Courts which are not provided for
by the constitution may be authorized to discharge func-
tions that are executive or legislative in character.    Thus
the county courts of this state, when they existed, not only
were authorized to perform judicial functions, but executive
and legislative as well.    This is permissible under all the
authorities.    *Stone v. Wilson,* 19 Ky. 126, (39 S. W. Rep.
49) ; *State v. Judges of Common Pleas,* 21 Ohio St. 1;
*Walker v. City of Cincinnati,* 21 Ohio St. 14, (8 Am. Rep.
24) ; *Phinizy v. Eve,* 108 Ga. 360, (33 S. E. Rep. 1007).
But powers not in themselves judicial, and that are not to be
exercised in the discharge of the functions of the judicial
department, cannot be conferred on courts or judges des-
ignated by the constitution as a part of the judicial depart-
ment of the state.    *Hayburn's Case,* 2 Dall. 409, (1 L. Ed.
436) ; *U. S. v. Ferriera,* 13 How. 40, (14 L. Ed. 42) ; *U.
S. v. Todd,* 13 How. 52, and note, 14 L. Ed. 47; *Supervis-
ors of Election Case,* 114 Mass. 247, (19 Am. Rep. 341) ;
*Appeal of Norwalk St. R. Co.,* 69 Conn. 576, (37 Atl. 1080,
39 L. R. A. 794) ; *Houseman v. Judge,* 58 Mich. 364, (25
N. W. Rep. 369) ; *Smith v. Strother,* 68 Cal. 194, (8 Pac.
Rep. 852) ; *Stevens v. Truman,* 127 Cal. 155, (59 Pac.
Rep. 397) ; *People v. McKee,* 68 N. C. 429; *State v. Bar-
bour,* 53 Conn. 85, (22 Atl. Rep. 686, 55 Am. Rep. 65) ;

*Taylor v. Com.,* 3 J. J. Marsh. Ky. 401; *State v. Young,*
29 Minn. 474, (9 N. W. Rep. 737); *McRae v. Railroad
Co,* 93 Mich. 399, (53 N. W. Rep. 561, 17 L. R. A. 750);
*Muhllenburg Co. v. Morehead,* 20 Ky. 376, (46 S. W. Rep.
484); *State v. Railroad Co.,* 46 Neb. 682, (65 N. W. Rep.
766, 31 L. R. A. 47); *Ex parter Griffiths,* 118 Ind. 83, (20
N. E. Rep. 513, 3 L. R. A. 398, 10 Am. St. Rep. 107);
*Rees v. City of Watertown,* 109 Wall. 107, (22 L. Ed. 72).
Of course, the act itself need not be judicial in character.
If the general power be judicial, or if the act itself be in
aid of some judicial function, it is sufficient. Thus the
exercise of judicial power may be essential in the discharge
of executive functions. *Sawyer v. Dooley,* 21 Nev. 390,
(32 Pac. Rep. 437); *People v. Simon,* 176 Ill. 165, (52
N. E. Rep. 910, 44 L. R. A. 801, 68 Am. St. Rep. 175).
And courts, in the discharge of their duties, may be required
to exercise executive or administrative powers. They may
be authorized to make contracts to keep court rooms in re-
pair *Board of Commissioners v. Gwin,* 136 Ind. 562, (36
N. E. Rep. 237, 22 L. R. A. 402); may appoint commis-
sioners to apportion and assess damages for the opening of
a highway [*Salem Turnpike & Chelsea Bridge Corp. v. Es-
sex County,* 100 Mass. 282; *City of Terre Haute v.
Evansville & T. H. R. Co.,* 149 Ind. Sup. 174, (46 N. E.
77, 37 L. R. A. 189); *Tuolumne County v. Stanislaus
County,* 6 Cal. 440]; may appoint jury commissioners
[*State v. Kendle,* 52 Ohio St. 346, (39 N. E. Rep. 947)];
may determine whether a municipal corporation shall be
created, or adjoining territory annexed [*City of Burling-
ton v. Leebrick,* 43 Iowa, 253; *Wahoo v. Dickinson,* 23
Neb. 426, (36 N. W. Rep. 813); *Winfield v. Linn,* 60 Kan.
Sup. 859, (57 Pac. Rep. 549); *Ford v. Town of North Des
Moines,* 80 Iowa, 626]. But in each and all of these cases
the powers are either judicical in character, or are to be ex-
ercised in the discharge of functions pertaining to the judi-
cial department. If the matter is one requiring some judi-

cial determination, it may be left to the court or to judges, although it is not involved in the determination of an actual case litigated in the ordinary manner. Thus the propriety and necessity of the construction of a bridge over railway tracks may be left to a judge for decision. *Williams v. Railroad Co.,* 71 Conn. 43, (40 Atl. Rep. 925). So may the power to pass on a liquor license. *McCrea v. Roberts,* 89 Md. 238, (43 Atl. Rep. 39, 44 L. R. A. 485). Courts cannot fix railroad, telegraph, telephone, water, and other rates, although they may pass on the reasonableness thereof. *Steenerson v. Railroad Co.,* 69 Minn. 353, (72 N. W. Rep. 718); *State v. Railroad Co.* 46 Neb. 682, (65 N. W. Rep. 766, 31 L. R. A. 47); *Nebraska Tel. Co. v. State,* 55 Neb. 627, (76 N. W. Rep. 171, 45 L. R. A. 113); *State v. Johnson,* 61 Kan. Sup. 803, (60 Pac. Rep. 1068, 49 L. R. A. 662). Fixing rates in such instances is purely a legislative act, which cannot be delegated to a constitutional court. With a few dissenting voices, these seem to be the conclusions reached by the courts of the country, and they fully accord with our views. The appointment of trustees to manage and control a system of waterworks belonging to a municipal corporation in advance of litigation or of any dispute concerning their management or control is surely not a judicial function. It is more nearly administrative; but with the affairs of the corporation and the management of its property courts have nothing to do in advance of some dispute. If courts are to select city officials, they may also select those who are to administer the affairs of the county; and it is not going too far to say that they may also be authorized to select state officials. Such a union of power would, as said by Chancellor Kent in *Dash v. Van Kleeck,* 7 Johns. 477, (5 Am. Dec. 291), "result in tyranny." See, also, *Kilbourn v. Thompson,* 103 U. S. 168, (26 L. Ed. 377); 1 Blackstone, Commentaries, 269. "That which distinguishes a judicial from a legislative act is that the one is a determination of what an existing law is in re-

lation to some existing thing already done or happened, while the other is a predetermination of what the law shall be for the regulation of future cases falling under its provisions." So wrote Judge Cooley in his invaluable work on Constitutional Limitations (108). Generally speaking, appointment to an office is an executive function. True, not every appointment is executive in character, for appointments may be made by judicial officers in the discharge of their official duties, and the legislature may appoint the officers necessary to enable it to discharge its duties and to maintain its separate existence. These do not involve an encroachment on the function of any other branch. The appointments authorized by the act in question are in no manner connected with the discharge of judicial duties, and to our minds clearly fall within the prohibition of the article of the constitution hitherto quoted. Much more might be said in support of the conclusion reached, but this opinion has already outgrown proper limits. Judges of courts created by the constitution should not be burdened with executive or administrative duties. They should, as nearly as possible, be freed from everything not judicial in character. Respect for the position has materially lessened whenever judges have attempted to discharge duties of an executive character. The judge should have no favors to grant, no patronage to dispose of, and no friends to reward. The spoils system should have no place in the selection of judicial officers. The manifest purpose of the legislature in passing the act in question and placing the appointing power in the hands of the judiciary is a compliment that speaks loudly of the integrity fairness, and independence of judicial officers; but, if they are put on a plane with other officials, who are compelled to, or who, at least, in many instances do, use their appointing power to further their own interests, will they not sacrifice their standing as judges, and defeat the very objects intended to be secured? Let us adhere to the traditions

and history of the past; let the judge be supreme in his field, the legislator in his, and the executive remain where the constitution placed him; let the three co-ordinate departments of government be preserved intact; let neither trench upon the other; and our liberties will be preserved, and our rights duly maintained. Municipal reforms must come from within, and not from without. Good government can only be secured by the active co-operation of good citizens. Those who remain away from the primary and the election and refrain from voting are not only forgetful of their duties, but through neglect they suffer crime to flourish and corruption to reign supreme. They put themselves on a level with the worst elements by consenting to their practices, and in some instances profiting from them, and are morally, if not legally responsible for existing conditions. The property-owning taxpaying classes, who suffer most, from a material point of view, under mismanagement and corruption, have the remedy in their own hands if they choose to exercise it. This remedy is not by placing all municipal affairs under the control of the judiciary, but by taking the same interest in the administration of local affairs that they manifest in the conduct of their private business. All the authorities seem to agree that legislative and judicial interference in purely municipal matters "has tended very greatly to lessen the sense of responsibility on the part of local officials and upon the part of communities themselves." Goodnow, Municipal Problems, pp. 38, 39.    Seth Low's article on "Municipal Home Government" in 1 Bryce, American Commonwealth, chapter 52.

We have given the case the care and attention its importance demands, and, while fully recognizing the rule that an act of the legislature should not be declared unconstitutional unless plainly and clearly within its limitations, are nevertheless constrained to hold that the act cannot be sustained.—REVERSED.