M. R. HARRIS ESTATE, Appellee, v. WEST GROVE SAVINGS BANK et al., Appellees; L. A. ANDREW, State Superintendent of Banking, Intervener, Appellant.

JANUARY 17, 1928.

REHEARING DENIED DECEMBER 14, 1928.

*John Fletcher*, Attorney-general, *Maxwell O'Brien*, Assistant Attorney-general, *Ben J. Gibson*, and *Jones & White*, for appellant.

*T. A. Goodson* and *George F. Heindel*, for M. R. Harris Estate, appellee.

*Roberts & Roberts* and *Taylor & Taylor*, for West Grove Savings Bank, appellee.

MORLING, J.—Intervener was denied appointment as receiver of the West Grove Savings Bank because of his being interested adversely to the bank and its creditors. It is argued in the certiorari proceedings, and is argued here, that, under the present banking laws, only the superintendent of banking may be appointed receiver of any closed bank, and that the court has no jurisdiction to appoint anyone else, regardless of personal interest of the superintendent. In our view of the case, we have no occasion to discuss the question as applied to a bank which merely closes its doors without making any arrangement for the payment of depositors or the liquidation of its affairs. See generally *Picklesimer v. Morris*, 101 W. Va. 127 (132 S. E. 372), and cases there cited. See further on this point, and on the constitutional questions that might thereby be raised, Justice Albert's concurring opinion in *Leach v. Exchange State Bank of Stuart*, 200 Iowa 185, 199; *Laird Bros. v. Dickerson*, 40 Iowa 665, 670; *Claussen v. Lafrenz*, 4 G. Greene (Iowa) 224; *Cooper v. Armstrong*, 3 G. Greene (Iowa) 120; *State ex rel. White v. Barker*, 116 Iowa 96, 108; *Wine v. Jones*, 183 Iowa 1166, 1176; *State ex rel. Howell v. Wildes*, 34 Nev. 94 (116 Pac. 595); *State ex rel. Hovey v. Noble*, 118 Ind. 350 (21 N. E. 244); *Witter v. County Comrs. of Cook County*, 256 Ill. 616 (100 N. E. 148); *People ex rel. Vanderburg v. Brady*, 275 Ill. 261 (114 N. E. 25); *In re Appointment and Removal of Janitor of Supreme Court*, 35 Wis. 410. See, also, *State ex rel. White v. Barker*, 116 Iowa 96; *Greer v. Merchants & Mech. Bank*, 114 Ark. 212, 214 (169 S. W. 802).

The bank now before us arranged for payment of its de-

positors, closed its business as a bank, and took proceedings for dissolution. We shall, therefore, limit our discussion to the question whether Chapter 189, Acts of the Fortieth General Assembly, operates to deprive the district court of jurisdiction, under the facts of this particular case, to appoint as receiver a person other than the superintendent of banking, and whether the denial of the appointment to the intervener was within the authority and discretion of the trial court.

Section 1877, Code of 1897, provided:

"When it shall appear to the auditor of state [the superintendent of banking] that any savings or state bank has refused to pay its deposits in accordance with the terms on which such deposits were received, or has become insolvent, or that its capital has become impaired, or has violated the law, or is conducting its business in an unsafe manner, he shall, by an order addressed to such bank, direct a discontinuance of such illegal or unsafe practices, and require conformity with the law. * * * If any such bank shall fail or refuse to comply with the demands made by the auditor of state, or if the auditor of state shall become satisfied that any such bank is in an insolvent or unsafe condition, or that the interests of creditors require the closing of any such bank, he may *authorize a bank examiner appointed by him to take possession of any such bank, whereupon the right of levy * * * shall be suspended, and the auditor of state may forthwith, with the assent of the attorney-general, apply to the district court or judge thereof for the appointment of a receiver for such bank, and its affairs shall be wound up under the direction of the court * * ** "

By Chapter 189, Acts of the Fortieth General Assembly, the italicized portion of the section was stricken out, and in place of it was inserted the following:

"appoint an additional bank examiner to assist him in the duty of liquidation and distribution, whereupon the right of levy * * * shall be suspended, and the superintendent of banking may apply to the district court * * * or a judge thereof, for the appointment of said superintendent as receiver for such bank, and its affairs shall thereafter be under the direction of the court, and the assets thereof after the payment of the expenses of liquidation and distribution shall be ratably distrib-

uted among the creditors thereof, giving preference in payment to depositors. The attorney-general * * * shall represent the superintendent of banks in all proceedings provided for hereunder. No general assignment for the benefit of creditors shall be of any validity. The superintendent of banking henceforth shall be the sole and only receiver or liquidating officer for state incorporated banks and trust companies * * * "

The amendment is divided by the Code editor into sections (Code of 1924, Section 9238 et seq.), pursuant to Section 169 of said Code.

It was held in Leach v. Exchange State Bank of Stuart, 200 Iowa 185, that the statutes as so amended "constituted a separate and complete code of laws governing the organization, operation, and liquidation of state banks, and controlled the distribution of their assets, notwithstanding the general provisions of Section 3825-a," Code Supplement, 1913. In that case it was further held that the amendment "gives to the superintendent of banking, independently of the appointment of a receiver, the power to liquidate an insolvent bank and distribute its assets," without the assistance of the court, and without the necessity of being appointed by the court as receiver, but it was said:

"We would not be understood as saying that, where the superintendent of banking is not appointed receiver, his actions in the winding up of the affairs of a bank and distributing its assets are beyond the control of the court, or as expressing any doubt of the power of the court, in a proper case, to afford appropriate relief, as against the superintendent of banking, when, in that capacity only, he undertakes the liquidation of an insolvent bank * * * . Whether these provisions operate to take away the right, heretofore recognized, of an individual to ask for the appointment of a receiver for a banking corporation, we do not determine; but that they do deprive the court of the power to deny to the superintendent of banking the right expressly conferred upon him to act as receiver, if one is needed, and, in any event, to liquidate the bank and distribute its assets, is clear."

The question litigated and determined in that case was whether, under the amendment, an independent school district was entitled to a preference under Section 3825-a, Code Supple-

ment, 1913, for a debt due to it, or under the sovereign prerogative of the state. The bank involved in that case had not turned over its deposits and bills receivable to another bank, nor had that part of its affairs peculiar to the business of banking been largely closed out, as is the case here. The discussion must be considered with reference to the facts there under review.

The peculiar attributes of banks are principally receiving deposits and paying checks thereon, and issuance of circulating notes. While banks engage in loaning money and discounting commercial paper, that function is not peculiar to them. In practice, state banks are no longer banks of issue. The most important function of banks, as such, is now, therefore, that of receiving and paying deposits; although, in their dealing with banking correspondents, in making collections, and in rediscounting paper, special confidence may be reposed in them because they are banks. The chief purpose of state supervision is to protect and safeguard the public in their relation to the bank as depositors and in the acceptance of checks as a convenient circulating medium. Their safety, and, in case of closing, their liquidation, are matters of general public interest. State supervision and administrative liquidation are, therefore, a proper exercise of the police power of the state. *Noble State Bank v. Haskell*, 219 U. S. 104 (55 L. Ed. 112); *Shallenberger v. First State Bank*, 219 U. S. 114 (55 L. Ed. 117); *Kentucky Union Co. v. Commonwealth of Kentucky*, 219 U. S. 140 (55 L. Ed. 137); *Commissioner of Banks v. Prudential Tr. Co.*, 242 Mass. 78 (136 N. E. 410); 7 Corpus Juris 474, 480. The banking laws must be construed in the light of the purpose of their enactment, the evils to be cured, and the remedy designed, as well as in connection with statutes *in pari materia*, and in harmony with general principles of law.

On general principles of equity jurisprudence, chancery will take jurisdiction to wind up the affairs of a corporation which has become insolvent, or whose business can no longer be advantageously carried on. *Price v. Holcomb*, 89 Iowa 123; *Dickerson v. Cass County Bank*, 95 Iowa 392; 14A Corpus Juris 1088; 7 Ruling Case Law 731; 4 Cook on Corporations (7th Ed.), Section 863. Prior to the enactment of Chapter 189, Acts of the Fortieth General Assembly, the court might assume such jurisdiction in the case of banks. *Dickerson v. Cass County*

*Bank,* 95 Iowa 392; *Paine v. Mueller,* 150 Iowa 340; *Buena Vista County v. Marathon Sav. Bank,* 198 Iowa 692. Even in the case of a going bank, failure or refusal of the commissioner of banking to act is recognized as sufficient ground for the interposition of a court of equity. An interested party is not without remedy because the officer intrusted with the duty of liquidation neglects or refuses to perform it. *Leach v. Exchange State Bank of Stuart,* 200 Iowa 185, 194; *Cartmell v. Commerciul Bank & Tr. Co.,* 153 Ky. 798 (156 S. W. 1048); *Picklesimer v. Morris,* 101 W. Va. 127 (132 S. E. 372); *Board of County Comrs. v. Peterson,* 118 Kan. 560 (235 Pac. 848). In the case now before us, it appears that, on July 1, 1925, according to the report of the examining committee, the loans amounted to $58,322.06. There was due from banks $901.18. All other cash items amounted to $1,195.56. The expense in excess of profits was $860.24, the deposits amounted to $33,620.35, bills payable, $9,672, collateral attached, $12,000. The banking house, furniture, and fixtures were reported at $11,500, capital stock and surplus $20,000, undivided profits, after deducting expenses, $486.69. $9,079.22 of bills receivable was reported as past due, $7,279.22 thereof, three months or more past due. There is evidence that, about the 14th or 15th of July, 1925, some arrangement was made between the bank and Mr. Andrew, by which a deed of land belonging to the bank and standing in the name of decedent, because of which decedent had assumed accommodation liabilities, was quitclaimed by the West Grove Savings Bank to Mr. Andrew, or to the Citizens Savings Bank, of which he was president. The deed was not recorded. Mr. Mowery, the cashier of the Citizens Savings Bank, testifies that he had made a search for it, but was unable to find it. He thought it was among the papers kept in Mr. Andrew's desk. He testifies:

"He handled that West Grove Savings Bank transaction mostly himself; and his desk was locked, so that I did not have access to it, and I did not have a key."

Mr. Andrew was not a witness. He says in argument that at the time of the trial he was in Washington, D. C. There is, however, no showing of any application for a postponement of the trial, to procure his testimony. On July 15, 1925, a bank examiner, Rugg, had an interview with the directors of the West

Grove Savings Bank. There is evidence that he then referred to the bank as being in bad shape, and to the necessity of having something done. There is indefinite testimony of his being in communication with Mr. Andrew, in process of closing the bank. The examiner, on July 16, 1925, arranged an agreement with the Moulton Savings Bank, whereby it took over the deposits of the West Grove Savings Bank, amounting to $31,333.54. As security therefor, the directors of the West Grove Bank gave to the Moulton Savings Bank their notes for the full amount of the deposits, secured by mortgages on their farms. As further security, the West Grove Savings Bank turned over to the Moulton bank bills receivable amounting to $45,746.21. The cashier of the Moulton bank testifies that he advised one of the directors of the West Grove bank not to give notes or borrow money to pay depositors,—that it was an unjust obligation; "but he [the director] said that he felt that he was willing to do it." He also testifies that the Moulton bank did not get all the notes that it was to get. There is testimony tending to show that of the notes which the Moulton bank was to receive as collateral, a considerable amount was not received, but substituted by Waybill for it was $13,000 of worthless paper. The transfer was made, and the West Grove bank finally closed its doors on July 16, 1925. It is admitted that notice of dissolution of the bank was published. There is testimony tending to show that at least some of the directors understood that there was a considerable deposit in the Citizens Savings Bank of Ottumwa, and that the cash and that deposit were to be turned over to the Moulton bank. The next morning, July 17, 1925, an employee of the West Grove bank, at the direction of the cashier, took to the Citizens Savings Bank a quantity of cash, the amount of which she did not know, and which is not shown. She testifies that she gave Mr. Andrew an envelope given to her by the cashier, Waybill; that Mr. Andrew told the cashier of the Citizens Savings Bank, Mr. Mowery, to go to her car and get the money, which he did. The Citizens Savings Bank account with the West Grove bank, according to the books of the former, showed, at the close of business July 16, 1925, an overdraft of $1,030.01; on the 17th, an overdraft of $263.24. The account shows deposits on the 16th of $380.53 and $47.00, and on the 17th, of $666.87 and

$99.90. Also, the following: "Late the 17th, $782.32 cash, $519.08. Items returned July 18. July 18th, account closed."

Mr. Mowery testifies that:

"We had probably closed our books on the 17th before receiving the $782.32. The last item of credit probably shows on July 18th, thus closing the account."

His recollection of details differs from that of other witnesses. The evidence is that the Citizens Savings Bank held a certificate of deposit of the West Grove bank for $9,500, secured by collateral. What the collateral was, does not appear, except by inference that it was notes, and perhaps the land previously mentioned. Mr. Mowery testifies that he filed claim against the plaintiff estate on various notes executed by decedent to the Citizens Savings Bank, or to the West Grove bank and indorsed to the Citizens Savings Bank. These notes totaled upwards of $30,000. He says:

"I did not find any of these notes in the bank files, and do not know whether they are still owned by the Citizens Savings Bank. Mr. Andrew takes care of such bank records exclusively, and in his absence I do not have access to the records. * * * With the exception of the note for $1,800 which was assigned as collateral, the Citizens Savings Bank purchased the above names [notes?] from the West Grove Savings Bank. The Citizens Savings Bank keeps a record of such notes, which is kept by Mr. Andrew; and I do not have access to that record, which is also locked in his desk; and I have no way of ascertaining, in the absence of Mr. Andrew, whether those notes have been paid."

Of the notes which the cashier of the Moulton bank says the Moulton bank was to get, but did not get, none is specifically shown to have been held by the Citizens Savings Bank, except one for $1,000 and one for $71.69. These notes are claimed by the Citizens Savings Bank as owned by it, and not as collateral. As has been noted, the $9,500 certificate of deposit was not included in the deposits taken over by the Moulton bank. It would appear that the total of the bills receivable of the West Grove bank at the time it closed was from $58,000 to $63,000. The character of the paper is not shown, further than has been indicated. Mr. Andrew was formerly a stockholder in the West

Grove bank, but sold his stock to Waybill. Mr. Andrew holds something less than half of the stock of the Citizens Savings Bank.

The foregoing evidence is set out to indicate the uncertainty of the facts and the want of knowledge on the part of the plaintiff and of the directors, other than Waybill, of the West Grove Savings Bank, and also of Mowery, rather than as a statement of facts proved, as to which, in our view of the case, no question is presented for our determination.

This suit was brought by the administrator for an accounting to him. No general accounting of the affairs of the West Grove bank, or specific accounting between it and the Citizens Savings Bank or with creditors of the West Grove Bank other than plaintiff and his decedent, is involved. Neither intervener nor Waybill, nor the examiner, Rugg, was a witness. The evidence which has been set out is now relevant to intervener's demand for appointment as receiver. It may be that, in a proper proceeding, between proper parties, it will appear that neither Mr. Andrew nor the bank of which he is president is under liability in an accounting, and that neither the West Grove bank nor its creditors have any case against the Citizens Savings Bank or Mr. Andrew. He may be able to fully explain his action. The relevancy here of this evidence and of the facts and inferences sought to be deduced from it is in this: that the plaintiff and the sureties for the deposits and the Moulton bank have claims on which they are entitled to be heard, and that, in the pursuit of their remedy, they ought not to be embarrassed by the appointment of one as receiver who is interested in hostility to them.

Intervener has never taken possession of the West Grove bank. He has never applied for a receiver. The bank closed on July 16, 1925. He has never taken any action for liquidation. The only proceeding on his part was the filing of his petition of intervention on December 16, 1925, five months after the bank closed, in which he merely asks that, if the appointment of a receiver is to be made, he be appointed.

Apparently the duties of a receiver will be to take an account from the Moulton bank of payments on deposits and receipts from collateral, settle the liability of the West Grove bank to the Moulton bank, and liquidate the collateral; to search

for the cash that the West Grove bank had at the time it closed, and for the $519.08 said to have been returned; to take an account with the Citizens Savings Bank, with respect at least to the items of charge and credit after the West Grove bank closed, and of the collateral which Mr. Mowery says that bank holds for the $9,500 certificate of deposit, and ascertain the balance owed on that certificate; to take account of any other bills payable and of the collateral held therefor; to sell the real estate and fixtures of the West Grove bank; to endeavor to collect or sell any notes still held by the West Grove bank, or that are due to it as return of collateral; to pay any balance that may be owed the Citizens Savings Bank on certificate of deposit; and to pay the plaintiff's judgment, so far as these can be done.

In this connection, attention should be called to the evidence that the Citizens Savings Bank, after the West Grove bank was, as the Citizens Savings Bank officers knew, closed, received items of credit, including cash, and thereby, though only a general creditor, obtained a preference. By the state law, the depositors, and perhaps, subrogated to their claims, the sureties, were entitled to the preference. The bank of which intervener was president was only a general creditor. It has obtained, however, a preference, and is holding it, evidently with the personal participation of intervener.

The rights of depositors or holders of checks, when intervener was denied appointment, appear to be in no wise involved, and the liquidation of the bank is not a matter of general concern. The certificate of deposit held by the Citizens Savings Bank appears to be no more than merely the evidence of a loan secured by collateral. The investigation and account that will have to be made are in no wise peculiar to banking business. The bank, as a bank, and its banking business, as such, have been closed, and largely wound up. The bank (if not dissolved) is a corporation, and its relationship to its creditors and the remaining steps necessary to fully wind up its affairs are merely those necessary in the case of an ordinary corporation or suitor. They do not need the attention of the superintendent of banking, as such. All of the peculiar features of the banking business are, so far as regards the West Grove bank, at an end. The intervener has so treated the case. That he regarded himself as under no official duty to complete the winding up of the bank

52

is evidenced by his inattention to it for five months, and by his refraining up to the time of the trial from exercising any claim to possession or to appointment as a receiver. He in effect has refused, or at least is neglecting, to exercise any official duty in respect to this bank. His private interest as president and large stockholder in the Citizens Savings Bank is hostile to the interest of the plaintiff and to the directors who have mortgaged their property to the Moulton bank to secure the payment of the deposits of the West Grove bank. There are unexplained and unsettled items of importance in the business between the Citizens Savings Bank and the West Grove bank in which the plaintiff and the directors of the West Grove bank are deeply interested. This suit is in chancery. It was not brought by the superintendent of banking under the banking law, nor does such superintendent seek to take advantage of it as such. It is the plaintiff in a suit in chancery who is asking for the appointment of a receiver, as an auxiliary remedy,—but not for the purpose of liquidating or winding up a closed bank, under the banking law. The superintendent of banking merely asks that, should the court find that the appointment should be made, then he should be appointed. The court is asked to find that a chancery receiver should be appointed; and this is the appointment which, if made, the intervener is asking for. The case here, both on the merits and on the facts, is one for the appointment of a receiver in chancery, in the exercise of the general equitable jurisdiction of the court. The case is not one in which the superintendent of banking, because of illegal practices or insolvency of a bank, applies to the district court for his appointment as receiver.

While personal or adverse interest does not, of itself, disqualify one from being appointed as a receiver, the general rule, nevertheless, is that one so interested should not, except for special reasons, or under special circumstances, be appointed. 34 Cyc. 143; 23 Ruling Case Law 41. While the court has full power of supervision and direction of its receiver, it of necessity must rely largely upon his faithful and disinterested opinion and recommendations. These normally have weight with the court, and enter into the judgment. A judge interested in this proceeding, as Mr. Andrew is, would be totally disqualified to pass upon the case,—so much so that his judgment would be not

merely voidable, but void. Cooley's Constitutional Limitations (7th Ed.) 592, 593; *Peninsular R. Co. v. Howard,* 20 Mich. 18; *Bullock v. Robison,* 176 Ind. 198 (93 N. E. 998); *Stockwell v. Township Board,* 22 Mich. 341. The question is not whether, in the particular case, justice will miscarry. Litigants have the right to the judgment of a court who is above reasonable ground of suspicion of being actuated by self-interest or subject to hostile influence. Public policy imperatively demands that no judge shall act under circumstances which will create distrust or cast doubt upon his impartiality, or raise an inference of the presence of sinister influence. It is a general rule that no one, however exalted his character and personal integrity, shall be permitted to act for another in any case where his private interest may conflict with his duty, except where consent is freely given, on full information. It is the policy of the law, out of consideration for the frailities of human nature, to avert corruption by removing temptation. Excellence of character and reputation and honorable official position are not cause for suspending or relaxing this wholesome rule, which applies impartially to occupants of the highest and of the meanest places of public and private trust.—*Affirmed.*

EVANS, DE GRAFF, ALBERT, and KINDIG, JJ., concur.

WAGNER, J., not participating.